DENNIS G. SCHMIDT AND JOYCE E. SCHMIDT, APPELLANTS,
v. THAYER COUNTY BOARD OF EQUALIZATION, APPELLEE.
624 N.W. 2d 63

Filed March 20, 2001.   No. A-00-469.

Gregory C. Damman, of Blevens & Damman, for appellants.

Daniel L. Werner, Thayer County Attorney, for appellee.

HANNON, SIEVERS, and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

This is an appeal from a decision of the Nebraska Tax Equalization and Review Commission (TERC) affirming a determination by the Thayer County Board of Equalization (Board) regarding the valuation of a quarter section of agricultural property. The taxpayers appeal on the ground that the valuation was above market value for the land classes and soil types contained on the property. For the following reasons, we reverse, and remand for further proceedings.

## PROCEDURAL BACKGROUND

This appeal from TERC involves a quarter section of agricultural real property in Thayer County, Nebraska, owned by Dennis G. Schmidt (Schmidt) and Joyce E. Schmidt. This quarter section is farmed as dryland. The acceptable range of assessment for agricultural land is from 74 to 80 percent of the actual value. See Neb. Rev. Stat. §§ 77-201 (Cum. Supp. 2000) and 77-5023 (Cum. Supp. 1998). For convenience, we refer to the subject property as the "SW¼," and the dollar figures used herein are generally stated as the agricultural assessment as opposed to actual values. For the year 1999, the county assessed the SW¼, approximately 160 acres, at $126,750. The prior valuation had been $88,350. The Schmidts protested to the Board for the reason that the "[v]aluation is above market value for the land classes and soil types contained on this parcel" and requested a valuation of $99,840. The Board made no change to the valuation. The Schmidts appealed the Board's decision to TERC.

Prior to the TERC hearing, the Schmidts filed an objection to the Board's calling witnesses identified in its witness list, as the list was not provided to the Schmidts 30 days prior to the hearing as required by TERC's order and notice of hearing and because the Schmidts had not been provided with the substance of any expert testimony as required by the order. TERC determined that the Board had failed to comply with the order of hearing with respect to the witnesses and that no good cause had

been shown to excuse or explain the failure. TERC therefore ordered that the Board was limited to calling two expert witnesses, the county assessor and a licensed appraiser, and the witnesses would be limited to testifying to those matters in the exhibits submitted by both parties and in the record. The experts were barred from conducting a "Review Appraisal" of the professional appraisal commissioned by the Schmidts.

In TERC's findings and order affirming the decision of the Board, it determined that Schmidt's testimony as to the soil types in Thayer County and the productivity of that soil was based on the Thayer County soil survey. TERC found that Schmidt's opinion of value based on soil types had no foundation and therefore accorded it little or no weight. TERC further determined that five out of eight of Schmidt's comparable sales were not comparable and further found that Schmidt's opinion as to the value of the SW¼ was competent but not credible. TERC also found that the appraisal the Schmidts had commissioned was deficient in respects similar to the reasons it discounted Schmidt's opinion of value and therefore accorded it no weight. TERC did accept the testimony of the expert witness for the Board that the valuation on the SW¼ was correct and should not be changed. TERC ordered that the decision of the Board which denied the Schmidts' protest be affirmed and that the property be valued for the tax year 1999 at $126,750.

The Schmidts appeal from the decision of TERC for the reasons that the valuation of the SW¼ is above the market value for the land classes and soil types and that TERC failed to properly consider the evidence. The petition on appeal prays that the matter be remanded to TERC for the entry of an order finding that the proper valuation of the real property as of January 1, 1999, is $99,840.

## FACTUAL BACKGROUND

At the TERC hearing, Schmidt testified that he has farmed since 1972 and has dryland farmed the SW¼ since 1980, that he bought it for $800 per acre in 1983, and that he farms 960 acres total of irrigated and dryland property, some owned and some leased. He has a bachelor of science degree from the University of Nebraska in agricultural education. He testified that he

believes he has knowledge of real estate values by attending sales; by researching the records of the county assessor, particularly in preparing his protest; and by noting comparable sales. Schmidt prepared for the hearing before the Board by visiting the county assessor's office. The assessor showed him a map demarcating land referred to as "market area 1" and "market area 2." The SW¼ was contained in market area 1. Schmidt asked for comparable sales used in determining the valuation of his property. The assessor directed him to a stack of prior sales that were used in the valuation of the entire county. Schmidt performed his own research by going through the stack of prior sales and selecting eight sales that were, in his opinion, comparable. He used sales of dryland ground that were within a radius of approximately 5 or 6 miles of the SW¼ and had similar soil types. He admitted that two of his comparable sales were in 1993, but he used them because they were of "a high percentage of Class 1 land," were located near the SW¼, and were similar in topography to the SW¼. Using an old aerial photograph, Schmidt also produced a map of the SW¼ showing the soil types and percentage of soils. He was also of the opinion that irrigation on the SW¼ was not economically feasible. Schmidt admitted that there had been a general steady increase in land values since 1993.

The type and percentage of soils are important to the Schmidts' appeal, and we examine this factor more closely. The SW¼ contains soils of class 1D (45 percent of the total SW¼) and class 3D1 (49 percent). On the SW¼, the 1D soil is very good producing soil. The 3D1 soil can be good producing soil, but is generally of moderately low fertility, is difficult to farm because it has a tendency to be sticky and to ball up when wet, is very hard when dry, and can only be farmed when it has dried out. The 3D1 soil bisects the SW¼ from southwest to northeast making it difficult to farm separately and requires that the SW¼ be farmed as one piece. If the 3D1 soil was located in one corner or one side, for example, Schmidt could farm it separately. Schmidt stated that according to the Thayer County soil survey, there are only 2,015 acres of the 3D1 soil in the county, or approximately one-half of 1 percent. Further compounding the difficulty of farming the SW¼ is that a drainage ditch is located

in the interior of the 3D1 soil that bisects the SW¼. Schmidt asserted that because of the small percentage of 3D1 soil in the county and a relatively large percentage of 3D1 soil on the SW¼, the property is unique for valuation purposes.

With regard to his chosen comparable sales, Schmidt stated that some of the comparables contained very small percentages of 3D1 soil, the poorer producing soil, as compared to 1D soil, the better producing soil. Yet these comparables had sold for less than the SW¼ had been valued. Schmidt broke down the eight comparable sales into the type and percentage of soils on each parcel. The price per acre of Schmidt's eight comparables, as determined by the price paid at the time of previous sales, ranged from $580 to $840.

Schmidt also commissioned a professional appraisal of the SW¼ by Frank Bruning. Bruning personally inspected the property and considered the eight comparable sales that Schmidt had used. Bruning used a market or comparable sales approach, an income approach, and a soil type approach to arrive at an estimated actual value. The appraisal valued the real estate ranging from $85,700 to $124,000 actual value, depending on the approach. Bruning, who did not testify at the TERC hearing but whose appraisal was in evidence, rendered a written opinion that the most accurate actual valuation of the SW¼ was the market or comparable sales approach, which he determined to be $124,000. From this actual value as estimated by Bruning, and based on the information Schmidt had developed on his own, Schmidt argues that the assessed value should be set at $99,840, or approximately 80 percent of the actual value.

Schmidt disputed the value placed on the SW¼ by the Board because of the amount of 3D1 soil and the fact that it cuts across the entire SW¼, divides it, and requires him to farm it as one instead of separately. The 1D and 3D1 soils were each valued at $200 an acre more in market area 1 than in market area 2. Schmidt felt the Board did not take into consideration the negative effect that the 3D1 soil had on the other soil on the Schmidts' farm.

Jerry Knoche testified for the Board and stated that he is an appraiser by profession and had approximately 25 years' experience working with agricultural land appraisals. Knoche helped

appraise agricultural land in Thayer County in 1999 and helped establish market areas; however, he was prevented from testifying as to the basis for establishing the market areas because of the pretrial order. The Board did make an offer of proof as to what Knoche would testify to on this point. Knoche had advised the assessor not to change the 1999 SW¼ valuation as it was fairly assessed. Knoche had not physically inspected the SW¼ other than a drive around the property and did not know if the property had a potential for irrigation.

The only other testimony adduced by the Board was that of the Thayer County assessor. He testified that he established the market areas for Thayer County. The assessor was prevented by objection from explaining the basis of the establishment of the market areas because of the pretrial order. The Board made an offer of proof, stating that the assessor would testify that he established the market areas based on information contained in the "Property Tax Administrator's Published 1999 Ratios and Measures of Central Tendency" published pursuant to statute, the 1999 profiles for Thayer County, and the soil survey for Thayer County, none of which were admitted as an exhibit or evidence.

Thayer County had been divided into two market areas for assessment purposes. A map of the county indicates that the market areas are divided by a southwest to northeast stairstep line drawn on township boundaries. Market area 1 consists of 10 townships, and market area 2 consists of 6 townships. Market area 1 is generally of higher valuations than market area 2, except for grassland classes. Schmidt admitted that of his eight comparables, only four of them were within market area 1, two of which were the 1993 comparables. Schmidt testified that he was told by the assessor that he, the assessor, had relied on the market areas and that the difference between market areas 1 and 2 was that there was irrigation potential in market area 1.

TERC stated that "professionally accepted mass appraisal methods, the rules and regulations of the Department of Property Assessment and Taxation, the *Nebraska Agricultural Land Valuation Manual* (1999), and the *Nebraska Assessor's Reference Manuals*, Volumes 1 and 2 (Reissue 1999)," all recognize the use of market areas as an appropriate appraisal practice.

## ASSIGNMENTS OF ERROR

The Schmidts assign as error that TERC (1) failed to give proper weight to their uncontroverted evidence regarding the value of their property and that its decision was not supported by competent evidence, (2) arbitrarily created market areas for assessment and equalization purposes in violation of article VIII of the Nebraska Constitution, (3) accepted the market areas as valid without supporting evidence and used the market area when analyzing the comparable properties, and (4) found that market areas were subclasses of property.

## STANDARD OF REVIEW

Neb. Rev. Stat. § 77-5019(5) (Cum. Supp. 1998) provides that appellate review of a TERC decision shall be conducted for error on the record. When reviewing an order for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 606 N.W.2d 786 (2000).

## ANALYSIS

*Evidence of Valuation.*

There is a presumption that a county board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. From that point forward, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented. The burden of showing such valuation to be unreasonable rests upon the taxpayer on appeal from the action of the board. *Constructors, Inc. v. Cass Cty. Bd. of Equal., supra.*

The burden of persuasion imposed on a complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon the taxpayer's property when compared

with valuations placed on other similar property is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment. *Forney v. Box Butte Cty. Bd. of Equal.*, 7 Neb. App. 417, 582 N.W.2d 631 (1998). It must be demonstrated by evidence that the assessment is grossly excessive and is a result of arbitrary or unlawful action, and not a mere error of judgment. *Id.* Under this standard of "presumption" in favor of the Board that it faithfully performed its official duties in making an assessment and acted upon sufficient competent evidence, we must determine in the instant case if there is competent evidence to the contrary such that the presumption disappeared.

As we have previously noted in this opinion, TERC accorded little or no weight to Schmidt's opinion of the value of the SW¼. A resident owner who is familiar with his or her property and knows its worth is permitted to testify as to its value without further foundation; this principle rests upon the owner's familiarity with the property's characteristics, its actual and potential uses, and the owner's experience in dealing with it. *Johnson's Apco Oil Co. v. City of Lincoln*, 204 Neb. 397, 282 N.W.2d 592 (1979).

We find that TERC erred in determining that Schmidt's opinion testimony as to the value of the SW¼ should be accorded little or no weight. Schmidt testified to the basis of his opinion, and his testimony was received generally without objection. There was sufficient foundation establishing his familiarity with the SW¼. TERC determined that there was no foundation for Schmidt's opinion because the soil survey for Thayer County was not in evidence. However, a review of the record reveals that Schmidt's testimony regarding the soil types was based primarily upon his personal knowledge and that very little information from the soil survey itself was discussed. This testimony was received generally without objection. TERC did not consider three of the eight comparables because they were in market area 2 and did not consider two other comparables because they were irrigated instead of dryland. We can find nothing in the record as to why TERC did not consider the significance of the remaining three comparables. Furthermore, as will be seen in our discus-

sion with respect to the market areas, it was error for TERC to disregard the three comparables found in market area 2.

We also find that TERC erred in according no weight to the opinion of the appraisal by Bruning. The Board objected to Bruning's appraisal report on the grounds that it was produced in May 1999 and that the assessment date of the SW¼ was January 1, 1999, thus, in the Board's opinion, rendering the report not relevant. The objection was overruled, and the appraisal report was received as part of the record, although the Board's standing objection was noted. Bruning certified in his appraisal report that he had personally inspected the SW¼ and that the report had been made in conformity with the "Professional Standards of the Nebraska Real Estate Appraisers."

█ Actual value of real property for purposes of taxation may be determined using professionally accepted mass appraisal methods, including, but not limited to, (1) the sales comparison approach, taking into account factors such as location, zoning, and current functional use; (2) the income approach; and (3) the cost approach. Neb. Rev. Stat. § 77-112 (Cum. Supp. 1998). This statute does not require use of all the specified factors, but requires use of applicable statutory factors, individually or in combination, to determine actual value of real estate for tax purposes. *US Ecology v. Boyd Cty. Bd. of Equal.*, 256 Neb. 7, 588 N.W.2d 575 (1999).

In *US Ecology v. Boyd Cty. Bd. of Equal.*, US Ecology had produced testimony of a real estate appraiser who had performed an appraisal of the subject property and had certified that in conducting the appraisal, he complied with the "'Uniform Standards of Professional Practice . . . as promulgated by the Appraisal Foundation.'" 256 Neb. at 11, 588 N.W.2d at 579. The appraiser testified that he used a sales comparison approach, but did not use an income analysis, because buyers and sellers of farmland did not attach great significance to the net income produced. TERC found that the appraisal was not credible evidence for the reason that, among other things, the appraisal was based on the sales comparison approach and that no consideration was given to the income approach,

although standard appraisal practices dictate that a second approach to value is essential to support the opinion. The Nebraska Supreme Court held that TERC erred in disregarding the appraisal evidence because the appraiser had used one of the statutorily prescribed methods in arriving at his appraisal of the subject property and articulated a reason why another was inapplicable. The court held that his appraisal was therefore competent evidence which was entitled to weight in determining the actual value of the subject property. The evidence in the instant case likewise establishes that the appraiser's opinion was entitled to *some* weight.

Our determination that both Schmidt's testimony and the appraiser's report were incorrectly disregarded by TERC is consistent with *US Ecology v. Boyd Cty. Bd. of Equal., supra.* In that case, the court held that the opinions of an employee of the owner of the property and of a real estate appraiser as to the value of the subject property constituted competent evidence which caused the presumption of validity of the county board of equalization's valuation to disappear. Therefore, the reasonableness of the board of equalization's valuation was a question of fact based upon all the evidence presented, with US Ecology having the burden of showing such valuation to be unreasonable. In the instant case, the record contains little evidence that contradicts Schmidt's competent evidence of value of the SW¼. We therefore conclude that the presumption in the instant case in favor of the Board disappeared and that based upon all the evidence presented, the Board's valuation was unreasonable.

*Market Areas.*

The Schmidts' three remaining assignments of error all relate to the use of market areas in assessing the value of their property. Specifically, the Schmidts argue that TERC erred when it equalized real property in the county by arbitrarily creating and utilizing market areas in assessing taxes, in violation of article VIII of the Nebraska Constitution, in accepting the market areas as valid without supporting evidence, and in using the market areas when analyzing the comparable properties presented by Schmidt and in finding that market areas were "subclasses" of property. The Schmidts assert that the SW¼ is only one-half

mile from market area 2, which is valued at $200 less per acre than in market area 1.

The Nebraska Supreme Court recently addressed the use of market areas in *Bartlett v. Dawes Cty. Bd. of Equal.*, 259 Neb. 954, 613 N.W.2d 810 (2000). While the *Bartlett* case originated procedurally from an action by TERC to adjust assessments within a county in order to achieve equalization within the state pursuant to Neb. Rev. Stat. § 77-5026 (Cum. Supp. 1998), its discussion of the use of market areas is directly relevant in the instant action. The Supreme Court initially reviewed the statutory scheme for valuation of agricultural land:

> Agricultural land constitutes a separate and distinct class of property for purposes of property taxation. Neb. Rev. Stat. § 77-1361(1) (Cum. Supp. 1998). Neb. Const. art. VIII requires uniform and proportionate assessment within the class of agricultural land. Agricultural land is then divided into "categories" such as irrigated cropland, dry cropland, and grassland. Neb. Rev. Stat. § 77-1363 (Cum. Supp. 1998). These categories are further divided into subclasses based on soil classification.

*Bartlett v. Dawes Cty. Bd. of Equal.*, 259 Neb. at 962, 613 N.W.2d at 817.

In *Bartlett*, the Dawes County assessor had divided the county into four agricultural "market areas" for property tax purposes. The boundaries for each market area were based upon where assessment-to-sales ratios for various land sales fell on the county map. The boundaries were drawn along township or half-township lines; however, the market areas were not consistent with the soil classifications depicted on the soil map of Dawes County, and the assessor admitted that the township lines did not follow soil classifications. The board of equalization argued that TERC correctly found that the establishment of market areas is a professionally recognized method of mass appraisal under § 77-112, which provides:

> Actual value of real property for purposes of taxation shall mean the market value of real property in the ordinary course of trade. Actual value may be determined using professionally accepted mass appraisal methods, including, but not limited to, the (1) sales comparison

approach, taking into account factors such as location, zoning, and current functional use, (2) income approach, and (3) cost approach.

While the Supreme Court in *Bartlett* assumed without deciding that market area analysis is a professionally accepted mass appraisal method for establishing actual value, it rejected the use of market values in that case as violative of the statutory scheme set out by the Legislature.

> The evidence in this case indicates that the market areas established by the assessor were not, in fact, based on soil classification, but, instead, were based on assessment-to-sales ratios. Subclasses of agricultural land must be based on soil classification, not upon where the land is located. The market areas do not constitute subclasses of agricultural land as defined by our statutes.

*Bartlett v. Dawes Cty. Bd. of Equal.*, 259 Neb. at 963, 613 N.W.2d at 817.

In the instant case, the same, if not greater, deficiencies exist as in *Bartlett* with regard to the use of market areas in assessing value. In this case, there was little evidence presented by the Board to explain its basis for arriving at the market area divisions. The boundaries separating market areas 1 and 2 appear to be arbitrarily drawn, and there is no evidence to the contrary. It is clear that the market areas were not based on soil types, but, rather, on location of property within the county. Evidence adduced at the TERC hearing indicated that the potential for irrigation was a factor in justifying the use of the market areas; however, this factor alone ignores the statutory requirement that subclasses of agricultural land must be based on soil classification. Further, the evidence revealed that irrigation potential in the SW¼ was poor, thereby making its inclusion in the higher-valued market area 1 unjustified.

■ We conclude that TERC's approval of the valuation of the Schmidts' property based upon its location in market area 1, without relation to soil classification, was not supported by competent evidence and was arbitrary. As it is not necessary to the determination of this case, we decline to address the Schmidts' assignment of error alleging that the county's assessment practices violate article III of the Nebraska Constitution. An appellate

court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *Springer v. Bohling*, 259 Neb. 71, 607 N.W.2d 836 (2000).

## CONCLUSION

For the foregoing reasons, we reverse TERC's decision of April 7, 2000, affirming the Board's denial of the Schmidts' protest and remand this cause to TERC for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.