746 N.W.2d 717 (2008)
16 Neb. App. 578
Melvin VANDERHEIDEN et al., Appellants
v.
CEDAR COUNTY BOARD OF EQUALIZATION, Appellee.
Nos. A-07-373 to A-07-376 and A-07-383 to A-07-392.
Court of Appeals of Nebraska.
March 18, 2008.
*718 Boyd W. Strope, of Strope & Gotschall, P.C., O'Neill, for appellants.
Dennis D. King, of Smith & King, P.C., Gordon, for appellee.
SIEVERS, CARLSON, and MOORE, Judges.
MOORE, Judge.

INTRODUCTION
Fourteen owners of real property situated in Cedar County filed property valuation protests with the Cedar County Board of Equalization (County Board) challenging the 2005 assessed valuation of their property. Upon denial of the protests, the taxpayers appealed to the Nebraska Tax Equalization Review Commission (TERC), which consolidated their appeals for purposes of a hearing. Following presentation of evidence by the taxpayers and the county, the TERC determined that the taxpayers had not overcome the presumption that the challenged valuations were correct and therefore affirmed the decisions of the County Board. The taxpayers perfected this timely appeal. Because the TERC's decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable, we affirm.

BACKGROUND
The present appeals involve the valuation of agricultural land in Cedar County, Nebraska, for the tax year 2005 with an assessment date of January 1, 2005. For the tax year 2005, the county assessor divided the county into two market areas for the assessment of agricultural and horticultural land, described as "Market Area 1" and "Market Area 2." All but one of the 48 pieces of real property involved in these appeals are located in Market Area 2. Market Area 2 is located in the southeast portion of the county, consists of six townships, is rectangular in shape, and is 18 miles long by 13 miles wide. Township lines were used as the boundaries for Market Area 2 on the north and west sides. The east and south boundary lines of Market Area 2 are the county's boundaries with adjacent counties. Market Area 1 encompasses the balance of the county beyond the boundaries of Market Area 2. The assessment in question resulted in different valuations' being placed on land of the same soil type depending on the market area in which the land was located.
A hearing was held before the TERC in this case on November 15, 2006. The following issues for the hearing were agreed upon by the parties: (1) whether the market area analysis is a professionally accepted mass appraisal method, (2) whether the market areas as drawn by the county assessor comply with professionally accepted methodology for establishing value, (3) whether the use of market areas to determine the value of agricultural and horticultural land is prohibited by Nebraska's Constitution or by law, (4) whether the *719 taxpayers' property had been assessed uniformly and proportionately by valuing such property at the same percentage of actual value as other similarly situated property in the county, and (5) whether the taxpayers' property had been valued uniformly when the same or similar soil types within the same county have different values assigned thereto. At the hearing before the TERC, the taxpayers' position was that the County Board did not uniformly or proportionately order the correct taxable value for the taxpayers' agricultural property for the tax year 2005. The taxpayers presented an equalization argument only. The taxpayers alleged before the TERC that the market areas should not have been used and further alleged that the market areas in question were not properly created through professionally accepted methodology.
The taxpayers offered certain exhibits into evidence and the testimony of the Cedar County assessor, Don Hoesing. The County Board also provided certain exhibits, which were received into evidence, and the testimony of Hoesing; Catherine Lang, Nebraska's Property Tax Administrator; Jerry Knoche, an appraiser; and Barb Oswald, a liaison for Lang.
The taxpayers elicited testimony from Hoesing that there was irrigated ground in Market Area 1 being valued for less than dryland ground in Market Area 2. Hoesing affirmed that irrigated ground is generally valued higher than dryland ground.
The taxpayers did not produce any evidence of the actual value or characteristics of the subject properties other than the information listed on valuation documents offered by the County Board.
Lang reviewed the various sales statistics and gave her opinion that the levels of value in each market area were within the acceptable range. Lang noted that the average assessed sale price and average assessed value for the two market areas were significantly different from each other, indicating that the average selling price per sale was different between the two market areas and that the average assessed value was different. Lang testified that the only statistic that was outside the acceptable range was the price-related differential for Market Area 2, but she testified that the price-related differential is not as directly applicable in the agricultural statistics as it would be for residential real property. Lang testified further concerning the price-related differential figure in this case, stating that statistically it would be deemed to be high and that what that indicates in improved properties is that the market value for lower-priced properties is assessed at a higher level than that for higher-priced properties. Lang testified that in agricultural land, that is not as direct a comparison because the higher price paid may be for more acres of land.
Hoesing was recalled to testify by the County Board. Hoesing had been the county assessor for approximately 10 years, during which time he had noticed that land was selling for more in certain parts of the county. Hoesing testified that using a combination of several factors, only one of which was the sales ratio of sales in the county, he developed boundaries for market areas. In 2003, three market areas were established. In 2005, the north-south line separating the second and third market areas was removed and the new market area was designated Market Area 2.
Hoesing used several factors to establish the boundary lines for Market Area 2, including an examination of the land for soil types, productivity, availability of water, relation to market distribution points, land use, geography, and sales history. Based on this analysis, the boundary lines *720 were established using township lines on the north and west sides of Market Area 2 and the county's boundary lines on the east and south sides. Hoesing described differences in topography throughout the county. Hoesing stated that in the northeast part of the county along the Missouri River, a certain amount of recreational property exists which is used for, among other things, water-related activities. In that part of the county, there are more trees and brush, with grass area continuing to the south. In the northwest part of the county, there is less tree cover with more farming and pasture ground. Farms in the northern portion of the county raise "small grain hay crops," corn, and soybeans and have a fair amount of center-pivot irrigation. Hoesing also described the topography moving into the south part of the county, where the topography becomes more gently rolling with larger farms and fields, minimal grass, and less livestock production.
Hoesing testified that prior to his use of market areas, he had problems with some valuation results' not being within the acceptable range for the statistical analysis required by Nebraska statutes. Hoesing created certain documentary exhibits to demonstrate that substituting the values from one market area in the other market area resulted in unacceptable statistical results. The evidence demonstrated that the use of market areas in valuing agricultural and horticultural land in the county gave a more accurate picture of the market for agricultural land in the county than would have resulted from not using market areas. Hoesing testified that he began to use market areas because when he analyzed sales throughout the county, in the southern part of the county the level of assessment was historically and consistently lower than the level of assessment through the rest of the county.
Knoche testified that he had become familiar with the market characteristics of the two market areas. Knoche testified that in the northern portion of the county, "you get into what I call patch farming, because you don't have full quarters." Knoche testified that while some of the same soil types exist in both market areas, their distribution in the northern part of the county is "not in the generous portions that it is in the southern part of the county." Knoche described the occurrence of larger, consolidated farms with big fields in the southern portion of the county. Knoche was asked about a cluster of a particular soil type included in Market Area 1 and whether it would have been appropriate to include that cluster in Market Area 2. Knoche's recollection was that either there were no sales occurring in that area or there were several sales occurring in that area that matched more closely with the values in the northern portion of the county. Knoche opined that the agricultural land in Cedar County was assessed uniformly and proportionately within each market area.
Oswald testified in her role as liaison between the "Department of Property Tax Administration" and Cedar County. As liaison, her duties include consulting with the county assessor's office and analyzing the measurements of taxable value for agricultural and horticultural lands. Oswald had been the liaison for the past 9 years and had worked for the past 27 years in the business of assessing real property. Oswald holds both an assessor's certificate and a registered appraiser's license. As liaison, Oswald has 10 counties under her responsibility, all located in the northeast portion of Nebraska. Prior to testifying, Oswald reviewed the statistics for Cedar County and prepared various exhibits validating the use of market areas in Cedar County and the uniformity and proportionality of the assessed taxable value of *721 agricultural and horticultural land in Cedar County. Oswald testified that the property in Cedar County has been assessed uniformly and proportionately by valuing the property at the same percentage of actual value as other similarly situated property in the county.
The TERC issued a decision and order dated March 14, 2007, affirming the decisions of the County Board. In its written decision, the TERC provided some background information on market areas. The TERC then set forth the process an appraiser goes through to identify a market area's boundaries. The TERC stated that an appraiser's investigation begins with an examination of the subject property and its surroundings, proceeding outward, identifying all relevant and potential locational influences on the property's value. The appraiser extends the search outward to encompass all of the market influences affecting the property's value, and when no more factors are found, the boundaries for analysis are set. The TERC stated that county assessors in Nebraska have been guided by Neb.Rev.Stat. § 77-103.01 (Reissue 2003) as to which characteristics are to be considered in the creation and use of market areas; those characteristics include parcel use, parcel type, location, geographic characteristics, zoning, city size, parcel size, and market characteristics appropriate for the valuation of such land.
The TERC noted that the location of a particular soil type within the boundaries of a county has a bearing on the valuation for soil type. The TERC stated that location can be a positive or negative factor and that a location can be hampered by woodlands, rivers, or manmade structures or can be enhanced by its proximity to nearby elevators, more plentiful rainfall, or many items that only a buyer can define. The TERC further noted that market defines the value placed on property and that a certain market will pay more for property within certain locations. The TERC stated that the duty of an assessor is to be able to read that market and then assess the property in a uniform and proportionate manner.
The TERC reviewed the statistical exhibits prepared by Oswald and found the statistics were all within acceptable levels. The TERC noted that the exhibits prepared by Oswald showed that the statistics do not fall within the acceptable range when the values for agricultural and horticultural land in either market area are substituted for the values in the other area. The TERC concluded that the respective market area values work to create acceptable valuations which are uniform and proportionate for each market area and the county overall.
The TERC found from its review of the evidence that the taxpayers had not met their burden to show that the County Board was incorrect in its decision. The TERC further found that the taxpayers had not shown by clear and convincing evidence that the decision of the County Board was arbitrary or unreasonable. The TERC found that the taxpayers had failed to provide proof that their property was not valued uniformly and proportionately with respect to other property of similar type within the same market area and had failed to provide any evidence of actual value of the subject properties or any other evidence concerning the characteristics of the subject properties or the comparable properties, other than soil type.
The TERC found that the County Board had shown by reasonable evidence that the taxable valuation of agricultural and horticultural lands for 2005 in Cedar County was uniform and proportionate within each market area. The TERC found that market *722 area analysis was a professionally accepted mass appraisal method, but it cautioned that the creation of market areas must be accomplished using professionally accepted methodology. The TERC found that Cedar County did establish market areas using professionally accepted methodology and noted that Lang, Knoche, and Oswald, witnesses called by the County Board, testified that the use of market areas was a professionally accepted methodology for mass appraisal of agricultural and horticultural property. The TERC noted that witnesses Hoesing, Knoche, and Oswald testified that market areas were drawn in Cedar County with professionally accepted methodology. The TERC concluded that the market areas, as drawn by the county assessor, do comply with professionally accepted methodology for establishing value.
The TERC found that the taxpayers' properties had been assessed uniformly and proportionately at the same percentage of actual value as other similarly situated property in the county. The TERC found that the taxpayers' properties had been valued uniformly despite the fact that the same or similar soil types in the same county have different values assigned to them. The TERC found that the taxpayers had failed to meet their burden of showing that the County Board was incorrect or acted in an arbitrary or unreasonable manner. The TERC accordingly affirmed the decisions of the County Board determining taxable value of the subject properties as of the assessment date of January 1, 2005.

ASSIGNMENTS OF ERROR
The taxpayers assert, consolidated and restated, that the TERC erred in finding that the market areas as drawn by the county assessor complied with professionally accepted methodology. The taxpayers also assert, but do not argue, that the TERC erred in concluding that evidence used to establish the market area boundary lines in 2003 was inadmissible because it was not relevant. Errors assigned but not argued will not be addressed on appeal. Peterson v. Ohio Casualty Group, 272 Neb. 700, 724 N.W.2d 765 (2006).

STANDARD OF REVIEW
Decisions rendered by the TERC shall be reviewed by the court for errors appearing on the record of the TERC. City of York v. York Cty. Bd. of Equal., 266 Neb. 297, 664 N.W.2d 445 (2003). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. Id. Questions of law arising during appellate review of TERC decisions are reviewed de novo on the record. Id.

ANALYSIS
The taxpayers assert that the TERC erred in finding that the market areas as drawn by the county assessor complied with professionally accepted methodology.
The Nebraska Supreme Court addressed the use of market areas in Bartlett v. Dawes Cty. Bd. of Equal., 259 Neb. 954, 613 N.W.2d 810 (2000), a case originating procedurally from an action by the TERC to adjust assessments within a county in order to achieve equalization within the state under Neb.Rev.Stat. § 77-5026 (Cum. Supp. 1998). The Bartlett court reviewed the statutory scheme for valuation of agricultural land:
Agricultural Land constitutes a separate and distinct class of property for purposes of property taxation. Neb. Rev.Stat. § 77-1361(1) (Cum. Supp. 1998). Neb. Const. art. VIII requires *723 uniform and proportionate assessment within the class of agricultural land. Agricultural land is then divided into "categories" such as irrigated cropland, dry cropland, and grassland. Neb.Rev. Stat. § 77-1363 (Cum. Supp. 1998). These categories are further divided into subclasses based on soil classification.
259 Neb. at 962, 613 N.W.2d at 817.
In Bartlett, the Dawes County assessor had divided the county into four agricultural "market areas" for property tax purposes. The boundaries for each market area were based upon where assessment-to-sales ratios for various land sales fell on the county map, were drawn along township or half-township lines, and were not consistent with the soil classifications depicted on the soil map of Dawes County, a fact admitted by the assessor. The Dawes County board of equalization argued that the TERC correctly found that the establishment of market areas is a professionally recognized method of mass appraisal under Neb.Rev.Stat. § 77-112 (Cum. Supp. 1998). The Bartlett court assumed without deciding that market area analysis is a professionally accepted mass appraisal method for establishing actual value, but it rejected the use of the market areas employed in that case as violative of the statutory scheme set out by the Legislature, stating:
The evidence in this case indicates that the market areas established by the assessor were not, in fact, based on soil classification, but, instead, were based on assessment-to-sales ratios. Subclasses of agricultural land must be based on soil classification, not upon where the land is located. The market areas do not constitute subclasses of agricultural land as defined by our statutes.
259 Neb. at 963, 613 N.W.2d at 817. See, also, Schmidt v. Thayer Cty. Bd. of Equal., 10 Neb.App. 10, 624 N.W.2d 63 (2001) (relying on Bartlett in rejecting TERC's approval of valuation of property in market area not based on soil classification).
After the Supreme Court's decision in Bartlett, the Legislature enacted § 77-103.01, which currently states:
Class or subclass of real property means a group of properties that share one or more characteristics typically common to all the properties in the class or subclass, but are not typically found in the properties outside the class or subclass. Class or subclass includes, but is not limited to, the classifications of agricultural land or horticultural land listed in section 77-1363, parcel use, parcel type, location, geographic characteristics, zoning, city size, parcel size, and market characteristics appropriate for the valuation of such land. A class or subclass based on market characteristics shall be based on characteristics that affect the actual value in a different manner than [they affect] the actual value of properties not within the market characteristic class or subclass.
The Committee Statement for the bill that would ultimately be enacted as, among other things, § 77-103.01 provides:
Section 3 would provide a definition of "class or subclass of real property" to be applicable throughout the property tax statutes. According to the definition, a class or subclass is a group of properties that share characteristics not shared by those outside the class or subclass. The classification may be based on use, size, zoning, city size, or market characteristics. If based on the market, the class must be based on characteristics that affect market value. This change is a response to the Nebraska Supreme Court decision in Bartlett v[.] Dawes County Bd. of Equalization, 259 Neb. 954, [6]13 N.W.2d 810 (2000), which held that the TERC may not adjust by market *724 area to achieve intercounty equalization because market areas are not classes or subclasses of property found in the statutes....
L.B. 170, Revenue Committee, 97th Leg., 1st Sess. (Jan. 25, 2001). A review of the floor debate for the bill makes it clear that this statutory section was enacted in response to the decision in Bartlett v. Dawes Cty. Bd. of Equal., 259 Neb. 954, 613 N.W.2d 810 (2000).
For purposes of our review of the present case, the critical portion of § 77-103.01 is the requirement that "[a] class or subclass based on market characteristics shall be based on characteristics that affect the actual value in a different manner than [they affect] the actual value of properties not within the market characteristic class or subclass." The evidence adduced in this case shows that the market areas in question were drawn in compliance with this requirement. The evidence shows that the market areas in this case were established based upon an examination of the land for soil types, productivity, availability of water, relation to market distribution points, land use, geography, and sales history. Although the market area boundaries are drawn on township and county lines and do not follow soil classifications, the record shows that the topography varies throughout the county, that there are smaller farms in the north than in the south part of the county, and that the larger properties tend to sell for a higher value. The record shows that the use of market areas in valuing agricultural land in the county gave a more accurate picture of the market than would have resulted from not using market areas.
The statutes governing the TERC create a presumption that the County Board has faithfully performed its official duties and has acted upon sufficient competent evidence to justify its actions. City of York v. York Cty. Bd. of Equal., 266 Neb. 297, 664 N.W.2d 445 (2003). This presumption remains until there is competent evidence to the contrary presented. Id. Once the presumption has been rebutted, the burden shifts to the party requesting the exemption to prove its entitlement thereto. Id. The TERC found that the taxpayers had not presented evidence to overcome this presumption. We have reviewed the TERC's decision for errors on the record and find that the TERC's decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

CONCLUSION
The TERC did not err in finding that the market areas as drawn by the county assessor complied with professionally accepted methodology.
AFFIRMED.