FIRETHORN INVESTMENT, A NEBRASKA GENERAL PARTNERSHIP, AND FIRETHORN DEVELOPMENT CORP., A NEBRASKA CORPORATION, APPELLANTS, V. LANCASTER COUNTY BOARD OF EQUALIZATION, APPELLEE.

622 N.W. 2d 605

Filed February 9, 2001. No. S-00-485.

William F. Austin, of Erickson & Sederstrom, P.C., for appellants.

Gary E. Lacey, Lancaster County Attorney, and Michael E. Thew for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The appellants, Firethorn Investment and Firethorn Development Corp. (Firethorn), filed protests with the Lancaster County Board of Equalization (Board) after the assessed value of one of their properties, a golf course, was increased. The Board denied the protests, and Firethorn appealed to the Nebraska Tax Equalization and Review Commission (TERC). TERC upheld the Board's assessed valuation, and Firethorn appeals. We conclude that TERC erred in disregarding three sales of property as comparable sales solely because they were sales to a political subdivision. We further conclude that TERC erred in disregarding a comparable sale due to erroneous findings that no adjustments had been made to the sale and that a single sale of property could not provide evidence of market value. Accordingly, we reverse, and remand for further proceedings.

## BACKGROUND

Firethorn owns four tracts of land which compose a private golf course. At issue in this case is the value of the land underlying the golf course. The course was developed in 1979 pursuant to a special permit issued by the city of Lincoln (City) for the development of private recreational facilities and a community unit plan consisting of 82 dwelling units. The development was later expanded and now consists of 144 dwelling units. Under the community unit plan, the allowed residential density under zoning ordinances was transferred from some pieces of property to others. This allowed the construction of dwelling units in a smaller area than would normally be allowed, as long as the total number of dwellings constructed did not exceed the density authorized for all of the land. Under the community unit plan, the remaining open space, occupied by the golf course, is required to be devoted to recreational purposes. The property is outside the Lincoln city limits, does not have city utilities, and is zoned as an agricultural residential district (AGR).

In 1998, Firethorn developed and/or conveyed some of its real property. As a result, Firethorn requested a density bonus permit to allow the community unit plan to remain at 144 dwelling units. As a condition of receiving the permit, Firethorn granted the City conservation and preservation easements on the real property consisting of the golf course. The easements provided that the property be devoted to only open space and golf course uses for a period of 100 years. Richard Youngscap, the managing partner of Firethorn Investment and president of Firethorn Development Corp., testified that the community unit plan is an asset to Firethorn, but he considers the conservation easements to be a liability.

In 1999, the Lancaster County assessor notified Firethorn of tax increases due to an increase in the assessed valuation of the property. Under the 1999 assessment, the value of the property increased from $3,504,476 to $6,171,000. The increase was based primarily on an assigned land value of $15,000 per acre. Firethorn appeared before a referee appointed by the Board, Wayne Kubert, who recommended no change to the valuation. Firethorn then appeared before the Board, which also accepted the valuation. Firethorn then appealed to TERC.

PROCEEDINGS BEFORE TERC

Steven Allen, a certified real estate appraiser, testified for Firethorn. Allen testified that he appraised the golf course property using 31 comparable sales, with emphasis placed on 9 sales, but only 4 that were primarily relied on.

Allen testified that he inspected the property from the periphery before he did his appraisal. Because the property was limited to use only as an open space or golf course, Allen determined those were the highest and best uses of the property. Allen also testified that the property was outside of the city limits and did not have city utilities, such as sewer and water.

The first sale Allen relied on consisted of 160 acres purchased by the City for $2,500 per acre in September 1997 for purposes of expanding a nature center at a city park and to add nine holes to a golf course located at the park. The land was zoned agricultural (AG) instead of AGR and was located outside the city limits, and there were no utilities on the property.

The second sale consisted of 40 acres purchased by the City in September 1995 for $2,475 per acre. The land was zoned AG and was outside the city limits.

The third sale consisted of 156.55 acres purchased by the City for $2,900 per acre in June 1994, for development as a park. The land was zoned AG, did not have utilities available, and was located outside of the city limits.

The fourth sale consisted of 159.56 acres purchased for $4,237 per acre by a private party in October 1997 for development as a golf course. The property was zoned AG, was outside the city limits, and did not have utilities available.

Allen admitted that three of the four sales were to the City. Allen testified that he confirmed that the sales were arm's-length transactions by speaking with the City and that they were based on an appraisal of like-kind properties, with the purchase price negotiated from that price. Allen did not know if the properties were initially offered for sale on the open market or if real estate agents were involved. He also testified that properties zoned AGR would typically be more valuable than property zoned AG if the AGR property could be utilized for low-density residential purposes.

Allen testified that he adjusted the four sales for time and considered what might be superior or inferior about the properties before reaching a conclusion. In particular, Allen found the adjusted price of the fourth sale to be $4,558 per acre. Based on the sales, Allen opined that the fair and reasonable market value of the underlying land of the golf course property was $3,500 per acre.

Robert Stanley, the county appraiser who performed the assessment on the property, testified that when he made his assessment, he was unaware of the conservation and preservation easements on the property but that he was aware that the property was included in a community unit plan. The record shows that the Board was aware of the conservation and preservation easements.

In assessing the property, Stanley looked at sales of 14 properties but placed emphasis on 5 sales ranging in price from $10,000 to $24,758 per acre. None of the 14 properties were part of a community unit plan. The properties that Stanley emphasized most were generally either inside the city limits or had city services. The properties, however, were generally close in proximity to Firethorn's golf course property, including several that were across the street. The properties were generally zoned AG.

Stanley testified that he did not consider the sales Allen relied on comparable for several reasons. In regard to the sales to the City, Stanley testified that even in the absence of an overt threat of condemnation, the ability of the City to take the property is always present, thus making it a distressed sale. Stanley stated the policy of the county assessor's office was to always disqualify sales to or from governmental entities under Neb. Rev. Stat. § 77-1371 (Reissue 1996). Concerning the remaining sale, Stanley testified that the sellers of the property had an offer to sell the property for $5,000 per acre to a group planning to develop residential acreages. The sellers, however, chose to accept $4,200 per acre from the party who intended to use the land as a golf course because the sellers lived adjacent to the property and wanted a golf course next to them instead of additional homes.

In its findings and order, TERC found that the community unit plan and the conservation easements did not affect the fair

market value of the golf course property and that the highest and best use of the property was as a golf course. TERC further found that three of the four most comparable sales used by Allen were ones in which the City was the buyer. Based on this, TERC found that the record did not establish that any of the sales to the City reflected the current market value.

In finding that the sales to the City were not comparable, TERC relied largely on Stanley's testimony that the threat of condemnation is always present, along with the policy of the county assessor's office to always disqualify such sales. In addition, TERC cited to § 77-1371 for the proposition that "sales prices of real property which result from sales to or purchases from political subdivisions are generally not considered as representative of 'market value.'" In regard to the fourth sale presented by Allen, TERC concluded that nothing in the record established that any adjustments were made to the sale for time, location, and physical characteristics. TERC further concluded that one sale does not establish market value.

Utilizing information regarding Firethorn's purchase and sale of other property in 1998, TERC further reasoned that the remaining portions of Firethorn's property, including the golf course, were worth $16,814 per acre without taking into account substantial changes and differences in zoning among various portions of the property. In its brief, Firethorn presents figures indicating that the reasoning applied by TERC should actually show a value of $1,052.63 per acre. The Board states that it does not disagree that this finding by TERC was erroneous, but contends that any error was harmless.

Finally, TERC concluded that the comparable sales presented by the Board also caused concerns, but that the burden of persuasion was on Firethorn. TERC concluded that the action of the Board was not unreasonable or arbitrary and affirmed. Firethorn appeals.

## ASSIGNMENTS OF ERROR

Firethorn assigns, rephrased, that the district court erred in (1) failing to find that the community unit plan and conservation easements adversely affected the fair market value of the property and finding that the Board gave due regard to the restricted

use, (2) disregarding three comparable sales offered by Allen for the reason that the purchaser in those sales was a political subdivision, (3) disregarding the testimony of Allen that the fair market value of the property was $3,500 per acre, (4) determining that Firethorn paid $16,814 per acre for a portion of the property when the evidence showed that the actual purchase price was in the vicinity of $1,000 per acre, and (5) finding that the Board's assessment was supported by competent evidence and was not unreasonable or arbitrary and that Firethorn did not meet its burden of proof.

## STANDARD OF REVIEW

Appellate review of a final decision of TERC shall be conducted for errors on the record. When reviewing an order for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *US Ecology v. Boyd Cty. Bd. of Equal.*, 256 Neb. 7, 588 N.W.2d 575 (1999).

## ANALYSIS

Firethorn first contends that TERC acted unreasonably when it found that the Board gave due regard to the restricted use of the property. In particular, Firethorn argues that Stanley was unaware of the conservation easements on the property and that the Board disregarded the effect of the easements. Although Stanley was unaware of the conservation easements on the property, he was aware of the community unit plan. In upholding the assessed value, the Board was aware of both the community unit plan and the conservation easements. Both parties presented testimony that the highest and best use of the property was as a golf course and neither was able to locate sales of other properties subject to conservation easements when determining value based on comparable sales. TERC specifically found that due regard was given to the effect of the conservation easements on the property.

The Conservation and Preservation Easements Act, Neb. Rev. Stat. § 76-2,111 et seq. (Reissue 1996), provides:

> Real property subject to a conservation or preservation easement shall be assessed with due regard to the restricted

uses which the property may be devoted. The conservation or preservation easement in the hands of the holder shall be subject to assessment, taxation, or exemption from taxation in accordance with general laws applicable to assessment and taxation of interests in real property.

§ 76-2,116.

Under Neb. Rev. Stat. § 77-1511 (Reissue 1996), TERC shall affirm the action taken by a county board of equalization unless evidence is adduced establishing that the action taken by the board was unreasonable or arbitrary or unless evidence is adduced establishing that the property of the appellant is assessed too low. Section 77-1511 creates a presumption that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. *Bartlett v. Dawes Cty. Bd. of Equal.*, 259 Neb. 954, 613 N.W.2d 810 (2000). That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. *Id.* From that point forward, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented. *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 606 N.W.2d 786 (2000). The burden of showing such valuation to be unreasonable rests upon the taxpayer on appeal from the action of the board. *Id.*

We recognize the difficulty involved in valuing a unique property such as a golf course subject to a community unit plan and conservation easements. We note, however, that the parties chose to use the comparable sales approach to value the property but did not present evidence of sales of property subject to conservation easements. Instead, the parties generally presented evidence only of sales of open land in the local area, instead of looking to sales of golf courses in other areas. See, generally, *Wolf Creek Golf Links, Inc. v. Board of Johnson County Comm'rs*, 18 Kan. App. 2d 263, 853 P.2d 62 (1993) (appraisal considered sales of over 70 golf courses throughout United States and narrowed analysis to golf courses of comparable market and property characteristics). See, also, Daniel C. Stockford, *Property Tax Assessment of Conservation*

*Easements,* 17 B.C. Envtl. Aff. L. Rev. 823 (1990) (noting diffi-culty in using comparable sales approach to value property bur-dened with conservation easements).

In this case, both parties testified that the highest and best use of the property was as a golf course and that the property was used as a golf course subject to the community unit plan before the granting of the conservation easements. Stanley testified that he considered the effect of the community unit plan when mak-ing his assessment and that the easements had no effect on the highest and best use of the property as a golf course. Kubert also testified that he did not consider the conservation easements to have any bearing on the property's highest and best use. Thus, it was reasonable for the Board and TERC to determine that the limitations placed on the property by the conservation easements did not act to lower the value of the property since the limitations were generally similar to restrictions placed on the property through the community unit plan and to the use that has always been made of the property. See *Ross v. Town of Santa Clara,* 266 A.D.2d 678, 698 N.Y.S.2d 90 (1999). See, also, *Matter of Adirondack Mountain Reserve v. Board of Assessors of Town of North Hudson,* 99 A.D.2d 600, 471 N.Y.S.2d 703 (1984) (restric-tions on property did not affect highest and best use).

In addition, Firethorn did not present evidence to show how the conservation easements affected the value of the property. Without evidence of sales of property that are restricted in use, it is impossible to conclude that the restricted use of Firethorn's property actually lowered its value. See generally, *Wesson v. Town of Bremen,* 667 A.2d 596, 598 (Me. 1995) ("[i]f the tax-payer . . . fails to present credible evidence of just value, the [Bremen] Board [of Assessment Review] has no way of compar-ing the assessment and the taxpayer's view of just value"). Thus, in the absence of evidence through the use of comparable sales or another assessment method showing how the conservation easements affected the value of the property, and to what dollar amount, Firethorn has failed to meet its burden to overcome the presumption that the Board acted reasonably. Accordingly, we find this assignment of error to be without merit.

■ Firethorn next contends that TERC erred in failing to con-sider three sales of property to the City. Section 77-1371 provides:

"When using comparable sales in any method of determining actual value provided in section 77-112, the following guidelines shall be considered in determining what constitutes a comparable sale: . . . (6) Whether sales to or from federal or state agencies or local political subdivisions reflect current market value." Under Neb. Rev. Stat. § 77-112 (Cum. Supp. 1998), "[a]ctual value of real property for purposes of taxation shall mean the market value of real property in the ordinary course of trade."

■ In its order, TERC stated that the sales were disregarded because sales to a political subdivision implicitly carry a threat of condemnation and because it was the policy of the county assessor's office to disqualify such sales. Although TERC stated it found that the sales of property to the City did not reflect current market value, a reading of the order as a whole shows that this conclusion was based solely on the finding that sales to a political subdivision are always under a perceived threat of condemnation. Such a finding would act to always disqualify sales to a political subdivision. Nowhere do the statutes state that sales to a political subdivision are to be automatically excluded from consideration. Rather, this finding is contrary to the provisions of § 77-1371 which states that consideration shall be given to whether such a sale reflects market value. Thus, implicit in § 77-1371 is that such a sale could reflect market value under some circumstances. See, also, *Hon. Redev. Agncy. v. Pun Gun*, 49 Haw. 640, 426 P.2d 324 (1967) (holding in condemnation action that sales to political subdivision should not automatically be excluded as comparable sales as matter of law). Accordingly, we hold that a sale may not be disregarded solely because it is a sale to a political subdivision.

Allen testified that City officials confirmed that the sales were arm's-length transactions. Allen further stated that the sales were based on an appraisal price and negotiated from that price. Allen also testified, however, that he did not speak with the sellers of the properties and did not know whether the properties were placed for sale on the open market or if real estate agents were involved. Other than presenting evidence that sales to political subdivisions implicitly carry the threat of condemnation and that the policy of the county assessor was to always disqualify such sales, the Board presented no evidence that the

sales were not otherwise arm's-length transactions. TERC's order does not reflect that it considered these factors when determining whether the sales reflected market value. Accordingly, we reverse, and remand for TERC to consider whether the sales to the City reflected market value.

 Firethorn next contends that TERC erred in disregarding evidence of a fourth sale consisting of land sold in a private sale for the purpose of being developed into a golf course. TERC's order shows that consideration was not given to the fourth sale presented by Firethorn solely due to a finding that adjustments had not been made and because of a determination that a single sale cannot show market value. The record shows that Allen did make some adjustments to the property. Thus, we conclude that TERC's factual finding to the opposite was not supported by competent evidence. We further hold that a single sale may in some instances provide evidence of market value. We have recognized that in tax valuation cases, actual value is largely a matter of opinion and without a precise yardstick for determination with complete accuracy. *US Ecology v. Boyd Cty. Bd. of Equal.*, 256 Neb. 7, 588 N.W.2d 575 (1999). A single sale should not be excluded merely because it is a single sale. Rather, the fact that evidence of other sales is not presented goes to the weight of the evidence. TERC's order indicates that it gave no consideration to the sale due to an erroneous factual finding and because it was only one sale. Thus, we conclude that TERC erred in disregarding the fourth sale.

Firethorn finally contends that TERC erred in utilizing information regarding Firethorn's purchase and sale of property in 1998 to conclude that remaining portions of Firethorn's property, including the golf course, were worth $16,814 per acre without taking into account substantial changes and differences in zoning among various portions of the property. In its brief, the Board agrees that TERC erred, but contends that the error was harmless. We agree that TERC erred in making this calculation. Accordingly, TERC may not rely on this calculation on remand. Because we remand the cause for further consideration, we need not address whether the error was harmless.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.