BRUCE D. LIVINGSTON, APPELLANT, V. JEFFERSON COUNTY BOARD OF EQUALIZATION, APPELLEE.

640 N.W.2d 426

Filed February 26, 2002.    No. A-01-762.

Gregory C. Damman, of Blevens & Damman, for appellant.

Linda A. Bauer, Jefferson County Attorney, for appellee.

IRWIN, Chief Judge, and SIEVERS and MOORE, Judges.

SIEVERS, Judge.

In this property tax appeal, the taxpayer, Bruce D. Livingston, contends that the taxing authorities overvalued his house for tax year 2000 by failing to consider that the house is located in a remote area of Jefferson County, Nebraska, and less than 1 mile from a hog farrowing facility housing 5,200 hogs. Livingston unsuccessfully appealed the valuation of the Jefferson County Board of Equalization (Board) to the Tax Equalization and Review Commission (TERC). Livingston now appeals to this court.

### FACTUAL AND PROCEDURAL BACKGROUND

Livingston started a hog farrowing facility, State Line Swine, in 1990. In 1999, Livingston began to build a house near the facility so that he and his family could live nearby and participate in the business. The house is located in Jefferson County, more than 4 miles from a blacktop road and 14 miles from the nearest town with commercial businesses, Fairbury, Nebraska. He had to put in his own road from his house out to the county road. The road he built is not maintained by the county and at times can be traversed only with a four-wheel-drive vehicle.

Livingston served as the general contractor for the construction of his house, and his record of bills and receipts shows that he spent a total of $328,649.01 on construction. This amount excludes the $540 he spent for blueprints and the costs for his efforts as his own general contractor, and the grade work he did for landscaping. The Board calculated the actual cost of construction as $346,593.29. In 2000, the Jefferson County assessor valued the house at $540,205. Livingston filed a property valuation protest on August 24, 2000, claiming that an appraiser he had hired valued the house and land at $325,000. In response, the Board corrected an error in the measurement of the square footage

on the house's second story, reapplied its cost approach analysis, and reduced the valuation of the house to $399,321. The land was valued at $70,701, for a total property valuation of $470,022.

Livingston appealed the Board's decision to TERC, which held a hearing on June 6, 2001. At the hearing, Livingston, representing himself, presented the testimony of Ray Shinn, a general appraiser certified in Kansas and Nebraska. Shinn has been an appraiser since 1987 and worked as a county assessor for 3 years in Kansas. Shinn now works for a farm credit service based in Marysville, Kansas, where he has worked for approximately 9 years. Shinn testified that he has performed approximately 20 appraisals in Nebraska per year and about 1,500 total appraisals during his career, which appraisals have been 75 percent agricultural and 25 percent residential.

Shinn testified that in determining the square footage of the house, he first measured several walls on the outside of the house, and after comparing the measurements to the blueprints and determining that they were correct, he relied upon the house's blueprints in his calculations, which stated that the house had 3,456 square feet.

Shinn considered the "sales comparison approach" in valuing the house by choosing two sales in Jefferson County and two sales in Kansas—his "comparables"—to determine the market value of Livingston's house. The Nebraska comparables were located in Fairbury, and the Kansas houses were located in Washington County, approximately 15 to 20 miles from Livingston's house. Shinn testified that in choosing comparables, he attempted to find houses similar in size and age to Livingston's house which had sold within the last 2 years.

In addition, Shinn used the "cost approach" by determining the cost of construction (calculated using Livingston's figures) and comparing his figures to the 1999 Marshall and Swift cost estimating system for accuracy. Shinn testified that he did not use the income approach in valuing the house because a house of that type would not typically be purchased for rental use so as to produce income.

Relying on both the cost and sales comparison approaches, Shinn valued the land at $100,000, the house at $215,000, and the exterior site improvements at $10,000, for a total of

$325,000 for the entire property. In reaching his opinion of value, Shinn considered that a potential buyer would take into account the odor produced by the hog farrowing facility, as well as by Livingston's easement to spread hog manure on neighboring property across the road to the south (manure easement), plus the house's rural location. He could not testify to an exact dollar amount of these factors without an actual sale of the property, but gave his opinion that the hog farrowing facility and manure easement would require at least a 30-percent reduction and the rural location a 10-percent reduction in value, both of which are reflected in his valuation of $325,000. Shinn referred to such adjustments as "external depreciation."

On cross-examination, Shinn admitted that his comparables were ranch-style houses, not two-story houses like Livingston's. Shinn testified that he settled for the ranch-style houses as comparables because he was unaware of any two-story houses in the area which had sold within the previous 2 years. Shinn testified that he would not normally make any adjustments for the difference between a ranch-style house and a two-story house, except for adjustments for square footage. However, Shinn indicated that the sales comparison approach may not be the most reliable approach in valuing Livingston's house due to a scarcity of houses in the area of the same quality, size, and age as Livingston's. Thus, Shinn testified that as a result, he relied primarily on the cost approach and the 40-percent external depreciation as described above. Shinn testified that there were no real standards for determining the depreciation factor for external obsolescence such as the hog facility or manure easement; instead, he determines such "for that area, by looking at sales and things." Shinn took into consideration in determining the depreciation that the hog facility was roughly three-fourths of a mile from the house and that the manure easement was "right across the road." In addition, he considered "three or four" previous appraisals of properties with a house and a hog facility. Shinn conceded that his figures for external depreciation were subjective.

Finally, Shinn testified on cross-examination that his valuation, performed on June 21, 2000, probably would not have been affected by the real estate market had it been performed on January 1, 2000, the Board's assessment date, and that he

"would have came [sic] up with the same number" if his appraisal was on January 1.

Livingston testified that he is the only owner of the hog facility, which he built before building the house, and that he obviously intentionally built the house in close proximity to the hog facility and manure easement. Livingston testified that he was "pretty certain" that his house was insured for $325,000, which he said was the cost of replacement. When asked his opinion of the house's value, he testified that he would be "lucky" to sell the house for $200,000.

Arliss Brown, who has worked in the Board office for 31 years and has been the Jefferson County assessor for 7 years, but who is not a licensed appraiser, testified that it was difficult to get an exact square footage measurement of Livingston's house because it contained many different angles. She testified that she used a computer program to calculate the square footage of the house, which calculates more accurately than hand measurements. Shinn had used the blueprint square footage of 3,456, but Brown calculated it at 5,650 square feet. That number was reduced to 4,041 square feet after Livingston filed his protest with the Board, as Brown admitted that her first calculation was incorrect because on her first visit, she was unable to go upstairs and thus "assumed that that middle portion was all second story," which was not true. In addition, the figures entered in the computer had contained an extra "10 or 12 foot, on the north side of the house, that shouldn't have been there." Brown remeasured the house on the second visit, taking along a friend, who happened to be a county commissioner. TERC's decision found that the house had 3,456 square feet, the figure from the blueprints, which Shinn used.

## TERC'S DECISION

At the outset, we note that the value of the land upon which the house sits is not disputed and is not part of this appeal. In TERC's "Substantive Findings and Factual Conclusions," it accepted Livingston's calculation of total cost, $328,649.01, but noted that " '[v]alue and price are *not* synonymous,' " saying that value is " 'the monetary worth of [the] personal property to buyers and sellers.' "

TERC found that Shinn had failed to make adjustments to account for the differences in architectural style and cost of construction between ranch-style and two-story houses. TERC rejected one of Shinn's comparables as not truly comparable under professionally accepted mass appraisal methods. Further, TERC noted that two of Shinn's comparables sold 18 and 12 months before the appraisal and that Shinn had made no adjustment for time, which TERC said was one of the three most important adjustments under the sales comparison approach.

TERC further noted that Shinn's 30-percent external depreciation factor for the hog facility and 10 percent for the rural location were subjective and that Shinn had offered "no documentation to support these external depreciation factors." TERC also pointed out that Shinn described the house as being in " 'good' " condition in one section of his appraisal and " 'very good' " condition in another section. In addition, while Shinn described that the house's construction quality was " 'very good,' " Brown had determined that the quality of the house was " '[e]xcellent.' " TERC noted that "the difference between the two grades of construction can have a substantial impact on the determination of value under the Cost Approach."

TERC further found that " 'conditions and trends may substantially affect value over a short period of time' " (without any finding that there were any such trends or conditions operating between the date of Shinn's appraisal and the date of the Board's assessment), but that Shinn had been unable to correlate his June 21, 2000, opinion of value with the assessment date of January 1, 2000.

As we read TERC's decision, it rejected any external depreciation because it found that "the hog farrowing facility complained of is owned by the Taxpayer, and existed prior to the construction of the improvements" and that "the 'manure' easement was negotiated by the Taxpayer and was also in existence prior to the construction of the residential improvements." TERC seemed to find it important that Shinn had not considered "ownership of the operation, as required by the *Uniform Standards of Professional Appraisal Practice*." In addition, TERC found it relevant that Shinn had not mentioned in his appraisal that Livingston sells the offspring of sows when they

are between 11 and 14 pounds in weight and between 14 and 21 days in age.

TERC noted that Shinn's cost approach failed to consider the cost of finishing "the 1,864 square feet of living area in the basement," which included a second kitchen, a bathroom, a bedroom, and an office space. Further, TERC found that Shinn's opinion of value for improvements not credible because it was "based on a subjective opinion which the Appraiser was unable to support" and that Shinn's "errors of omission and mathematical inconsistencies" result in a misleading opinion of value.

TERC found that Livingston's opinion that the property would not sell for $200,000 was "not credible" because Livingston paid more than $300,000 for the improvements.

TERC found that there was only an 8-percent difference in value for the house between Shinn's appraisal (without any external depreciation) and the Board's assessment. TERC said that therefore, there was only a " 'mere difference of opinion' " and that the Board's cost approach was the most appropriate appraisal method for the house, citing the method's usefulness for newer properties and where sales data is scarce.

TERC ultimately found that the house was not overvalued, that nothing in the record demonstrates that the Board failed to faithfully perform its official duties or act upon sufficient competent evidence, and that there was no indication that the house's assessed value was grossly excessive or a systematic exercise of intentional will. According to TERC, Livingston failed to adduce clear and convincing evidence to overcome the statutory presumption in favor of the Board, and TERC found that the Board's valuation was neither unreasonable nor arbitrary and was supported by the evidence. TERC affirmed the Board's assessed value of $70,701 for the land and $399,321 for the house, for a total of $470,022. This assessed value is $145,022 more than Shinn's valuation of $325,000 for the entire property.

## ASSIGNMENTS OF ERROR

Livingston claims (1) that TERC erred in failing to give proper weight to his uncontroverted evidence regarding the value of his house and that TERC's decision was not supported by competent evidence; (2) that TERC erred in failing to consider the remote

location of his house and its proximity to a hog facility and manure easement, and (3) that TERC erred in failing to consider the actual square footage of his house in determining its value. The third assignment of error is not argued, and thus, we do not consider it. See *State v. Caddy*, 262 Neb. 38, 628 N.W.2d 251 (2001).

## STANDARD OF REVIEW

Appellate review of TERC's decision is for error on the record of TERC, and we may affirm, reverse, or modify the decision of TERC or remand the cause for further proceedings. Neb. Rev. Stat. § 77-5019(5) (Cum. Supp. 2000).

When reviewing a decision for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 606 N.W.2d 786 (2000); *Schmidt v. Thayer Cty. Bd. of Equal.*, 10 Neb. App. 10, 624 N.W.2d 63 (2001). In instances where an appellate court is required to review cases for error appearing on the record, questions of law are nonetheless reviewed de novo on the record. *Bartlett v. Dawes Cty. Bd. of Equal.*, 259 Neb. 954, 613 N.W.2d 810 (2000).

## ANALYSIS

*Introduction.*

Neb. Rev. Stat. § 77-1511 (Reissue 1996), which requires TERC to affirm a county board of equalization's action, unless evidence indicates that the board's action was unreasonable or arbitrary or that the property is assessed too low, creates a presumption that the board has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. *Firethorn Invest. v. Lancaster Cty. Bd. of Equal.*, 261 Neb. 231, 622 N.W.2d 605 (2001). That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. *Garvey Elevators v. Adams Cty. Bd. of Equal.*, 261 Neb. 130, 621 N.W.2d 518 (2001). From that point forward, the reasonableness of the valuation fixed by the board of equalization

becomes one of fact based upon all the evidence presented. *Constructors, Inc. v. Cass Cty. Bd. of Equal., supra.*

The burden of showing such valuation to be unreasonable rests upon the taxpayer on appeal from the action of the board. *Garvey Elevators v. Adams Cty. Bd. of Equal., supra.* Based upon the applicable law, a county board of equalization need not put on any evidence to support its valuation of the property at issue unless the taxpayer establishes the board's valuation was unreasonable or arbitrary. *Id.*

*Livingston's Opinion of Value.*

Livingston's first assignment of error contends that TERC failed to give proper weight to his uncontroverted evidence regarding the value of his house and that TERC's decision was not supported by competent evidence. As is evident from our summary of the evidence, the claim that Livingston's evidence of value was uncontroverted is not accurate.

A resident owner who is familiar with his or her property and knows its worth is permitted to testify as to its value without further foundation. *Schmidt v. Thayer Cty. Bd. of Equal., supra.* Livingston's opinion of value was conveyed by his testimony that he would be "lucky" to get $200,000 for the house. TERC found this opinion of value not credible in light of Livingston's testimony that the house cost over $328,000 to build. However, when a county board of equalization has determined the value of property, uniformly and impartially assessed through a formula in substantial compliance with statutes governing taxation, for reversal of the board's action, a taxpayer must show more than a difference of opinion concerning the assessed value of the taxpayer's real estate. *Cabela's, Inc. v. Cheyenne Cty. Bd. of Equal.*, 8 Neb. App. 582, 597 N.W.2d 623 (1999).

Shinn's valuation was disputed. TERC pointed out that Shinn and the Board used different ratings for construction quality and different dates of valuation. Further, TERC noted that Shinn failed to consider the cost of finishing the basement. TERC found that Shinn's "errors of omission and mathematical inconsistencies result in an opinion of value which is misleading," and we cannot say that this portion of TERC's decision was arbitrary, capricious, or unreasonable, as the record supports these

observations about Shinn's appraisal. A reviewing court in an error proceeding is restricted to the record before the administrative agency and does not reweigh evidence or make independent findings of fact. *Brunken v. Board of Trustees*, 261 Neb. 626, 624 N.W.2d 629 (2001). Therefore, neither Livingston's nor Shinn's valuations were undisputed, and the law is clear that we will not reverse merely if opinions on the value of the property at issue are different. We reject Livingston's first assignment of error.

*Effect of Hog Facility, Manure Easement,
and Remote Location.*

TERC's findings and reasoning concerning the hog facility, manure easement, and remote location are more troublesome. As we understand TERC's decision, any external depreciation for these factors was rejected because "the hog farrowing facility complained of is owned by the Taxpayer, and existed prior to the construction of the improvements" and "the 'manure' easement was negotiated by the Taxpayer and was also in existence prior to the construction of the residential improvements." TERC further reasons:

> The Taxpayer's hog farrowing operation is a "breed to wean" operation which the Taxpayer started in 1990. That the taxpayer testified that as of the assessment date his policy was to sell the offspring of sows when they are between 11 and 14 pounds in size and between 14 and 21-days in age.
>
> . . . That the Taxpayer's Appraiser made no mention of these facts in his appraisal, particularly the ownership of the operation as required by the *Uniform Standards of Professional Appraisal Practice.*

TERC's written decision does not explain why Livingston's ownership of the adjoining hog facility and manure easement or the fact that he built the house after the hog facility was operational are valid reasons (factually, legally, or logically) to reject the proposition that the value of Livingston's house is affected by being very close to a large hog operation in a rural location accessible only by a county road and then a primitive road or lane to the house. TERC's reasoning strikes us as

something akin to "estoppel" or perhaps "assumption of the risk." There is no authority to support this reasoning, and we find that it is fundamentally illogical. Moreover, why TERC considered the age and weight at which Livingston sells his young pigs important is unexplained by TERC's decision, nor is it apparent to us. The property being valued in this case is separate and distinct from the properties where the hog facility and the manure easement are located. Thus, the mere fact that Livingston owns the hog facility and did so when he built his house has nothing to do with whether external depreciation should be used because the house is very close to a hog facility, a separately valued and taxed piece of property. Perhaps TERC's decision to reject any external depreciation comes from the fact that Livingston derives economic benefit from owning the hog facility. But the income derived from the hog facility would not affect the value of the house, because the house and hog facility are separate and distinct properties for valuation and taxation purposes, and presumably, the hog facility's income is considered in some way in the valuation of that property.

■ The law is that under Neb. Rev. Stat. § 77-112 (Cum. Supp. 2000), the actual value of real property for purposes of taxation shall mean the market value of real property in the ordinary course of trade. Actual value may be determined using professionally accepted mass appraisal methods, including, but not limited to, the (1) sales comparison approach, taking into account factors such as location, zoning, and current functional use; (2) income approach; and (3) cost approach. Section 77-112 requires use of applicable statutory factors, individually or in combination, to determine the actual value of real estate for tax purposes. *Cabela's, Inc. v. Cheyenne Cty. Bd. of Equal.*, 8 Neb. App. 582, 597 N.W.2d 623 (1999). Here, because there are no real comparables, and the property is new, residential, and non-income producing, the cost approach is clearly the most appropriate method, as Shinn testified.

■ But, TERC's decision about Livingston's house, including the rejection of Livingston's $200,000 valuation for the house because it cost over $300,000 to build, ignores the concept of "overbuilding," which can be important in setting market value.

This concept has been explained by the Nebraska Supreme Court in *First Nat. Bank v. Otoe Cty.*, 233 Neb. 412, 414, 445 N.W.2d 880, 882 (1989), as follows:

> Physical depreciation results from deterioration of the improvements over time. Functional depreciation or obsolescence results from lack of market acceptance due to the obsolete nature of improvements, inability to recover the cost of unique features of a building suited to one business but unusable if the building is sold to another type of business, and decreased value caused by an improvement that is "overbuilt" in relation to the locale or community where the structure is situated. Economic depreciation results from external economic forces which depress the value of the property.

Justice Boslaugh's dissent in *First Nat. Bank v. Otoe Cty.* provides an excellent discussion of the concept of overbuilding and how it impacts valuation for tax purposes:

> "This issue can also arise where a private landowner, for personal reasons or simple improvidence, overbuilds for the neighborhood. He constructs a house that costs $150,000 in a neighborhood where all the other houses are worth about $75,000. In the relevant market, the house costing $150,000 may be worth $125,000 or $100,000, but not $150,000. Because it is an overimprovement for the neighborhood, the house, although brand new, should be valued at the market value, not at what it cost.
>
> "Merely because the owner may have constructed an improvement that cost more than the improvement is worth on the market should not subject the owner to a higher ad valorem tax.
>
> "Even if the structure is not an overimprovement, expenditures on it do not necessarily enhance its value dollar-for-dollar. A greenhouse, a gazebo, a tennis court, or a hot tub, while of value to the owner, do not necessarily add dollar-for-dollar to the usual selling price."

*Id.* at 425, 445 N.W.2d at 888, quoting *First Fed S & L Ass'n v Flint*, 415 Mich. 702, 329 N.W.2d 755 (1982).

Shinn's opinion on value reflected his opinion that the property was overbuilt, although he did not use that exact term. As

suggested by Justice Boslaugh's dissent, even though Livingston chose to locate his expensive house next to a hog facility for his own reasons and paid over $325,000 to do so, it is doubtful that he will get his costs back if he sells his house because it is unlikely that some buyer will find the house, at that location, as desirable as did Livingston, given the obvious negatives inherent in its location.

In a similar vein, we note *US Ecology v. Boyd Cty. Bd. of Equal.*, 256 Neb. 7, 588 N.W.2d 575 (1999), where the fact that the owner had paid a large premium over going market real estate values to acquire a site for a nuclear waste dump, did not determine the site's present actual value for property tax purposes when the necessary licenses for the dump had not been granted and there was no imminent likelihood of the licenses being granted, despite the property owner's expenditure of many times the purchase price to get the facility licensed. Thus, in *US Ecology* (perhaps an "overpaid" rather than an "overbuilt" case), the decision of TERC to rely on the premium price originally paid for valuation purposes was found to be arbitrary.

In the instant case, the Board introduced no evidence to dispute Livingston's evidence that the house was "overbuilt" for its location or that the hog facility would not affect its value. The Board, and in turn TERC, refused, without offering any justification, to consider external depreciation as a factor in valuing this house. While some might see overbuilding as a poor use of money, the property owner is nonetheless entitled to have his property valued with consideration of the fact that it is overbuilt for its location, just as US Ecology was not bound, for valuation purposes, by its premium purchase price.

An administrative agency's decision is "arbitrary" when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion. *Phelps Cty. Bd. of Equal. v. Graf*, 258 Neb. 810, 606 N.W.2d 736 (2000). To the extent that the Board and TERC refused to consider the impact of the hog facility and the house's remote and difficult-to-access location on the value of the house because Livingston owned both, that decision is unreasonable and arbitrary. Neither the Board nor TERC realistically consid-

ered the effect of the house's location next to a hog facility and manure easement and in an isolated location. For the Board and TERC to conclude that such facts are not important is arbitrary and unreasonable.

The whole concept of determining value must assume both a willing buyer and seller. *Forney v. Box Butte Cty. Bd. of Equal.*, 7 Neb. App. 417, 582 N.W.2d 631 (1998). The court in *Richards v. Board of Equalization*, 178 Neb. 537, 540, 134 N.W.2d 56, 58 (1965), said: "For purposes of taxation, the terms actual value, market value, and fair market value mean exactly the same thing." In the context of negotiations between a willing buyer and seller to arrive at fair market value, the neighboring hog facility and the house's location would unquestionably affect the market value of Livingston's house. Any other conclusion would mean that two identical houses, one located next to the railroad switching yard and the other next to the country club golf course, have identical values—an obviously arbitrary and illogical conclusion that no reasonable person would reach. See *Phelps Cty. Bd. of Equal. v. Graf, supra.*

Fair market value is at the heart of assessment for tax purposes. That many potential buyers would not look favorably upon the hog facility, and judge the home's value with reference thereto, is demonstrated by some well-known Nebraska cases in which homeowners have successfully sued hog facility owners for damages caused by interference with the use of their nearby homes. See, *Kopecky v. National Farms, Inc.*, 244 Neb. 846, 510 N.W.2d 41 (1994) (flies and odor interfered with use of home, and homeowners' children forced to stay inside); *Flansburgh v. Coffey*, 220 Neb. 381, 386, 370 N.W.2d 127, 131 (1985) (flies, rats, and odors from hog confinement facility described by court as "more than offensive").

It was arbitrary for the Board and TERC to ignore the effect that the nearby hog facility would have on the house's fair market value in the ordinary course of trade. No reasonable fact finder could conclude that in the real estate marketplace, a potential buyer would not notice, and react economically, to having a large hog facility very nearby while living in a remote location. Thus, the Board's valuation, and TERC's decision upholding that valuation, was arbitrary and capricious.

## CONCLUSION

We find that Livingston's evidence overcomes the presumption that the Board acted on competent evidence, because the record shows, by a qualified appraiser's opinion as well as the owner's opinion, neither of which was rebutted, that this house, while costing nearly $330,000 to build, was in effect "overbuilt for its location." Once the presumption is overcome, as here, from that point forward, the reasonableness of the valuation fixed by the Board becomes one of fact based upon all the evidence presented. See *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 606 N.W.2d 786 (2000). Therefore, we reverse, and remand with directions for TERC to consider Livingston's appeal from the Board anew on the record already created, but with specific consideration of the impact on the fair market value of the house because of the nearby hog facility, manure easement, and isolated location, irrespective of the fact that Livingston also owns the hog facility and irrespective of the fact that he chose to build in this location.

REVERSED AND REMANDED WITH DIRECTIONS.