753 N.W.2d 819 (2008)
276 Neb. 296
DARNALL RANCH, INC., appellant,
v.
BANNER COUNTY BOARD OF EQUALIZATION, appellee.
No. S-07-811.
Supreme Court of Nebraska.
August 1, 2008.
*822 Robert M. Brenner, of Robert M. Brenner Law Office, Gering, for appellant.
James L. Zimmerman, Banner County Attorney, Scottsbluff, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
Darnall Ranch, Inc. (DRI), owns several residences located on its ranch property in Banner County, Nebraska. It protested the 2004 valuation of each residence for tax purposes, but the protests were denied by the Banner County Board of Equalization (Board). DRI then appealed to the Tax Equalization and Review Commission (TERC), which upheld the valuations as determined by the Board. This is an appeal from the decision and order of TERC. We affirm in part, and in part reverse and remand with directions to adjust the 2004 valuations of two residences which are located in close proximity to a feedlot.

I. BACKGROUND
The 2004 valuations of the subject properties were based upon "replacement cost new less depreciation." The county assessor relied on data collected during a countywide reappraisal in 2003. She did not independently verify the data in determining the 2004 valuations. In a 2006 disciplinary proceeding before the Nebraska Real Estate Appraiser Board, the appraiser who conducted the 2003 countywide reappraisal admitted that she violated certain standards during the reappraisal and consented to disciplinary measures. The Banner County assessor was aware of the disciplinary proceeding, but was never informed that it involved deficiencies in the 2003 data collection. According to the county assessor, "[n]o one has ever proved that the data collection for 2003 was incorrect."
The 2003 data was entered into a computer program called TerraScan, which *823 was used by the county assessor to compute all 2004 valuations for residential and agricultural property in the county. The data included floor plan dimensions and ratings of the quality and condition of each residence. The quality and condition ratings were based upon criteria found in the Residential Cost Handbook, published by Marshall & Swift, LP, a reference manual commonly used in the valuation of real property. In this context, "quality" refers to the overall quality of the characteristics of materials and workmanship, as well as design and functional utility. "Condition" measures the extent to which physical deterioration or structural defects are present. Marshall & Swift costing tables and local multipliers are built into the TerraScan program. The assessor testified that the Nebraska Department of Property Assessment and Taxation is aware that Banner County uses the TerraScan program and has never objected to or questioned its reliability.
After the 2004 valuations were established, DRI filed protests for the residential properties which are the subject of this case. In each instance, the assessor recommended no change in the valuations, and the Board accepted this recommendation.
We shall refer to residences by the colloquial nomenclature utilized by the parties during the TERC hearing.

1. "FEEDLOT HOUSE" (PARCEL XXXXXXXXX)
The feedlot house is a two-story, single-family home built in approximately 1900, with a 90-percent stucco and 10-percent masonry veneer exterior and an area of 2,188 square feet. The assessor's data listed its quality as "Average" and its condition as "Badly-Worn." The 2004 assessed valuation was $17,765.
Gary Darnall, president of DRI, testified that this house is "basically in the middle of the feedlot." Trucks used to transport cattle, silage, grain, and manure pass within 40 feet of the house, day and night, causing problems with dust and flies. According to Gary, the house "is in disrepair" with defects in the doors and windows. Using his personal criteria, he described its quality as "very poor" and its condition as "badly-worn." In his opinion, the 2004 value of the feedlot house was $6,700.
Sheila Newell testified at the TERC hearing on behalf of DRI. Newell has held a real estate broker's license since 1989 and has been a certified general real property appraiser since 1996. At the time of her testimony, she served as chair of the Nebraska Real Property Appraiser Board. Newell inspected the feedlot house in November 2003 and again in September 2004, noting no changes between the two inspections. She described the house as being of "low" quality based upon its age, design, floor structure, windows, poor heating, lack of adequate utility outlets, and functional utility. She described the condition of the house as of January 1, 2004, as "[b]adly worn." Newell was not asked to express an opinion as to the 2004 valuation of the feedlot house.

2. "LANE'S HOUSE" (PARCEL XXXXXXXXX)
This is a single-family home occupied by Lane Darnall and his family, who have lived there since the home was built in 1992. It has a 100-percent masonry veneer exterior and an area of 1,555 square feet. The assessor's data listed its quality as "Fair +," meaning that it was between fair and average quality. The assessor rated the condition of the home as "Average." The 2004 assessed valuation was $101,492. There was no allowance for locational depreciation, because the assessor did not consider it to be "close enough" to the feedlot.
Gary, who is Lane's father, testified that Lane's house was built at a cost of approximately *824 $64,000, and there had been no major remodeling prior to 2004. Gary testified that the house is located across the road and about one-eighth of a mile from the feedlot which has a capacity of 20,000 head of cattle. He also testified that vibration from the 20 to 25 trucks going by the house each day have caused cracking of its walls and foundation. He stated that cattle are located on all sides of the house. Gary testified that there had been "extensive" electrical problems in the home since a 1999 lightning strike. In his opinion, the value of the home in 2004 was $52,264.
Lane, who is the general manager for production of DRI, agreed that cattle regularly graze on all sides of his home. He testified that heavy truck traffic to the feedlot located one-eighth of a mile from his home causes cracking in the drywall and basement walls. He believes that the home receives "above average wear" due to the presence of his teenage children and foreign exchange students hosted by his family. Lane expressed his "lay opinion" that the quality of the home is "fair" and that the condition is "fair to low." In arriving at the claimed value of $52,264, Lane applied a 50-percent locational depreciation due to the proximity to the feedlot.
Newell personally inspected Lane's house in November 2003. In her opinion, the quality of the home was "fair," due to material and workmanship which were below "market standards." She also rated the condition of the home as "fair," due to evidence of "deferred maintenance." She also testified that the proximity of the home to the feedlot should be considered in determining its value, but she did not quantify this opinion or express any opinion as to the value of the home in 2004.

3. "GARY'S HOUSE" (PARCEL XXXXXXXXXB)
Gary and his wife reside in this 2,046-square-foot stucco home built in 1920. An addition was built in 1977. The assessor's data listed its quality as "Average" and its condition as "Good." The 2004 assessed valuation was $56,203.
Gary testified that the assessor's data was incorrect, in that there is a bathtub in the main floor bathroom, not a shower as indicated by the assessor, and one of the closets is smaller than indicated. He testified that the roof is damaged and that the windows leak. He rated both the quality and condition of the home as "fair." In his opinion, the value of the home in 2004 was $30,626.
Newell inspected Gary's house in November 2003. She evaluated the quality of the original structure as "fair" and the quality of the addition as "average." She rated the condition of the entire structure as "fair." Newell did not express an opinion as to the value of the home in 2004.

4. "PARENTS' HOUSE" (PARCEL XXXXXXXXXA)
This 1,834-square-foot home was built in 1958. The exterior is 90-percent vinyl siding and 10-percent masonry veneer. It is occupied by Gary's mother. The assessor's data listed its quality as "Average+" and its condition as "Average." The 2004 assessed valuation was $100,998.
Gary testified that the roof of this home had its original shake shingles, which were badly worn, and that the roof leaked, causing interior water damage. In his opinion, the quality and condition of the home were both "fair." In Gary's opinion, the value of the home in 2004 was $63,500, which he characterized as "a layman's valuation from seeing other properties of similar homes that age, similar conditions." There was no evidence of other properties specifically considered by Gary in arriving at his valuation.
*825 Newell testified that on the basis of her November 2003 inspection of this property, she considered its quality to be "average" and she agreed with the assessor that its condition was also "average." Newell did not express an opinion as to the value of the house in 2004.

5. "LABOR HOUSE" (PARCEL XXXXXXXXX)
This house, located 3 miles west of the feedlot, was constructed in 1996 at a cost of $76,000. It is a one-story house with an area of 1,160 square feet and a vinyl siding exterior. The assessor's data listed its quality as "Fair+" and its condition as "Average." The 2004 assessed valuation was $71,893.
Gary testified that there was a "continuing problem with mold" in this house and that the problem existed as of January 1, 2004. Taking this into consideration, he expressed an opinion that the quality and condition of the house were both "fair" and that its value in 2004 was $58,307.
Newell testified that while she was "not an expert in . . . mold identification," in 2002, she observed what she considered to be mold on both the main level and the basement of the house. Her inspection in November 2003 revealed the mold was increasing. Newell considered both the quality and the condition of the house to be "[f]air." She did not express any opinion as to the value of the house or the effect of the observed mold on value.
TERC determined that there were two issues raised by the appeal: (1) whether the decision of the Board determining taxable value of the subject properties was unreasonable or arbitrary and (2) the taxable value of the subject properties on January 1, 2004. TERC determined that it would not consider any equalization issues, because DRI had not raised such issues in its protests to the Board. TERC further determined that DRI had not shown the 2004 valuations of the subject properties to be unreasonable or arbitrary and that the evidence of actual value presented by DRI was not persuasive and was an insufficient basis for relief. TERC affirmed the determinations of the Board with respect to the 2004 valuations of the subject properties.

II. ASSIGNMENTS OF ERROR
DRI assigns, restated, renumbered, and consolidated, that TERC erred in (1) applying an incorrect legal standard as to its burden of persuasion, (2) conducting the hearing in a manner that deprived it of procedural due process, (3) failing to conclude on the basis of the evidence that the 2004 valuations by the Board were arbitrary and capricious, (4) failing to consider equalization as an issue on appeal, and (5) failing to consider and make findings on all issues presented.

III. STANDARD OF REVIEW
Decisions rendered by TERC shall be reviewed by an appellate court for errors appearing on the record of the commission.[1] When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[2] Questions of law arising during appellate review of TERC decisions are reviewed de novo on the record.[3]

*826 IV. ANALYSIS

1. TAXPAYER'S BURDEN OF PERSUASION
Citing statutory authority and an opinion of the Nebraska Court of Appeals,[4] the TERC order recited the legal principle that TERC "can grant relief only if there is clear and convincing evidence that the action of the County Board was unreasonable or arbitrary." DRI argues that because of amendments to the TERC statutes in 2004 and 2007, this principle is no longer correct. We considered and rejected this same argument in Brenner v. Banner Cty. Bd. of Equal.,[5] and we therefore do not address it here.

2. PROCEDURAL DUE PROCESS
DRI argues that TERC conducted the appeal hearing in a manner which deprived it of due process rights to present evidence and be heard before an impartial board.[6] It contends that formal rules of evidence were applied, despite the fact that the hearing was to be informal, and that the chairman of the TERC panel frequently interrupted its presentation and "became an advocate."[7]
The Tax Equalization and Review Commission Act (TERCA)[8] specifies the procedures applicable to taxpayer appeal hearings. Such hearings are to be informal "unless a formal hearing is granted" upon the request of a party.[9] In this case, the order for hearing specified that the hearing was to be informal. TERC was required to "give probative effect to evidence which possesses probative value commonly accepted by reasonably prudent persons in the conduct of their affairs excluding incompetent, irrelevant, immaterial, and unduly repetitious evidence" and to honor statutory privilege rules, but was "not otherwise. . . bound by the usual commonlaw or statutory rules of evidence."[10]
As we held in Brenner v. Banner Cty. Bd. of Equal.,[11] TERC must be afforded some discretion in determining the probative value and admissibility of evidence in an informal appeal hearing, and it follows that a proper exercise of such discretion cannot constitute a denial of procedural due process.
DRI states that TERC sustained objections to several exhibits it offered and argues that the cumulative effect of these rulings was prejudicial. DRI makes no attempt to explain why the rulings excluding these exhibits were incorrect. We note that after the initial rulings, at least two of the exhibits were subsequently reoffered and received. TERC excluded several exhibits offered by the Board, based upon objections by counsel for DRI. Viewing the record as a whole, TERC applied the same standard of admissibility to evidence offered by both parties and DRI therefore suffered no prejudice.
DRI also argues that the TERC chairman interrupted its presentation in a manner which demonstrated bias. While interruptions did occur, we cannot conclude *827 from the record that they were indicative of bias. We regard the interruptions as attempts to clarify or focus a particular question or line of inquiry, or to indicate an area in which additional information was needed. TERC has statutory authority to "utilize its experience, technical competence, and specialized knowledge in the evaluation of the evidence presented to it."[12] In an informal hearing, TERC must have a certain degree of latitude in seeking clarification and focus of testimony as it is received.[13] There is nothing in the record to suggest that TERC exercised this authority in a manner prejudicial to DRI.
For these reasons, we conclude that DRI was not deprived of procedural due process.

3. VALUATION
The "actual value" of real property is defined by Nebraska law as
the most probable price expressed in terms of money that a property will bring if exposed for sale in the open market, or in an arm's length transaction, between a willing buyer and willing seller, both of whom are knowledgeable concerning all the uses to which the real property is adapted and for which the real property is capable of being used.[14]
In tax valuation cases, actual value is largely a matter of opinion and without a precise yardstick for determination with complete accuracy.[15] As we have noted, DRI had the burden of persuading TERC that the Board's valuation of its property was arbitrary or unreasonable. An administrative agency's decision is "arbitrary" when it is made in disregard of the facts or circumstances without some basis which would lead a reasonable person to the same conclusion.[16]
Actual value of real property for purposes of taxation "may be determined using professionally accepted mass appraisal methods, including, but not limited to . . . (1)[the] sales comparison approach ... (2)[the] income approach, and (3)[the] cost approach."[17] The assessor testified that values were determined on the basis of "[replacement cost new less depreciation when compared to the sales roster." DRI does not criticize the use of this approach, but contends that it was not correctly applied by the assessor and the Board.

(a) Physical Characteristics of Property
DRI contends that neither the assessor nor the Board had personally inspected any of the residences to determine their actual physical characteristics before arriving at the 2004 valuations. The assessor acknowledged this, but testified that she relied on data collected during the 2003 countywide reappraisal. The assessor also acknowledged that the person who conducted the 2003 reappraisal was subsequently disciplined for certain irregularities which occurred during the reappraisal, but the assessor was never informed that there was any problem with the 2003 data collection. Generally, an assessor may reasonably rely on physical measurements made by an appraiser as part of a mass appraisal.[18] Here, the assessor also testified *828 that when she inspected the properties subsequent to the 2004 valuations, she found no errors in the data utilized in 2004. Under similar circumstances, the Court of Appeals concluded that the presumption of validity was properly applied to the valuation as determined by a board of equalization.[19]
Gary testified generally that the data collected in 2003 was inaccurate, but the record does not reflect any significant errors. The assessor conceded that one property was shown on her records as having a "crawl area" when, in fact, it did not. However, she explained that the TerraScan program uses "crawl area" as the default description of the base of a residential structure and attributes no value to it. If the structure has a basement, which does affect value, that information is manually included in place of the "crawl area" designation.
The record does not reflect any significant errors or discrepancies in the description of the physical characteristics used to determine the 2004 valuations. Lane admitted that he utilized the county assessor's data in arriving at his opinion of the value of the residence where he lived.

(b) Costing Methodology
DRI argues that the Board's 2004 valuations were arbitrary and unreasonable because the assessor did not follow regulations and manuals promulgated by the Property Tax Administrator, and specifically those published by Marshall & Swift, LP, such as the Residential Cost Handbook and Marshall Valuation Service. The assessor testified that the TerraScan program which she utilized in determining the 2004 valuations utilized costing information published by Marshall & Swift, and the record cards generated by TerraScan include a notation that data used for calculations is supplied by Marshall & Swift. The reports make reference to a "Manual Date," and the record cards reference "Marshall Swift tables" dated June 2001. The assessor testified that she did not know if Marshall & Swift published new costing tables in June 2001 and that she did not manually compare the TerraScan information on the DRI properties to the Marshall & Swift tables, but, rather, relied upon the program to use the correct information.
Newell testified as to her understanding that Marshall & Swift compiles data and issues updates on a regular basis. She stated that "quarterly multipliers should then be used to trim the costs published on the pages that you already have in your Handbook to a current date to adjust the costs." The following exchange then occurred:
[DRI's counsel:] Now, specifically were there sheets distributed forit comes out in a book for June 1st of 2001 for averagelow quality, fair quality, average quality, good quality, that would cover thea change made for June, 2001?
[Newell:] For residential there were not.
Q That's
A For residential
[TERC chairman]: Is that for the cost factors ... or is that
[Newell]: It
[TERC chairman]: I'm sorry. I can't tell whether counsel is asking you the definitions of change or did the cost factors change.
[Newell]: I believe the question was, did you receive a new page, printout, data.

*829 [TERC chairman]: Cost factors?
[Newell]: On June of 2001 for the residential section.
[TERC chairman]: All right.
[Newell]: That's why I said, no, not for the residential.
[TERC chairman]: But it's a cost factor. It's not the descriptor. It's not the definitions.
[Newell]: Yes, cost.
[TERC chairman]: And it wasn't a factor that you would apply to a prior value.
[Newell]: Wasn't the multipliers.
[TERC chairman]: Wasn't the multiplier, all right.
[DRI's counsel]: Thank you.
The record lists a Marshall & Swift Valuation Service Manual dated "6/2001" as one of the documents which TERC could consider and utilize without inclusion in the record pursuant to § 77-5016(3), although it does not appear that TERC made specific reference to this manual in this case.
DRI argues, on the basis of this evidence, that the TerraScan program utilized incorrect Marshall & Swift costing information in arriving at the 2004 valuations. We cannot determine from the rather confusing record whether or not this is so. Moreover, DRI offered no evidence as to which Marshall & Swift manual should have been used, or whether the use of a different manual would have resulted in lower valuations. While we acknowledge that this evidence raises some questions regarding the costing methodology employed by the assessor, we cannot conclude on the basis of this evidence alone that the valuations derived from the TerraScan program utilizing Marshall & Swift costing information were arbitrary or unreasonable.
DRI also argues that an audit of the Banner County assessor's office conducted by the Department of Property Assessment and Taxation for the period of October 2001 through January 2002 is probative of deficiencies in the 2004 valuations at issue here. We are not persuaded by this argument and agree with the conclusion of TERC that on this record, it cannot be determined that "discontinued assessment practices for years prior to 2003 affected valuation of the subject property for the tax year 2004."[20]

(c) Taxpayer's Opinions Regarding Quality, Condition, and Value
DRI argues that TERC failed to properly consider the taxpayers' opinions and those of its expert regarding the quality, condition, and value of the subject properties. TERC determined that Gary's testimony regarding the quality and condition of the properties was not related to any specific criteria or standards. The record supports this determination. When asked on cross-examination what he considered "low" quality, he replied, "I don't have the definition of it. It would be just my definition." He conceded that what he might consider to be "low" quality, someone else might consider "average." He could not say if his definition of "fair" was the same as that utilized by Marshall & Swift.
In contrast, Newell's testimony regarding the quality and condition of the subject properties was based on the Marshall & Swift criteria. She agreed with the assessor's determination of the "average" quality and condition of the parents' house, but her ratings of the other properties were somewhat lower than those of the appraiser. For example, Newell testified that she observed mold in the labor house and rated the condition of the structure *830 as "fair," compared to the assessor's rating of "average." Newell acknowledged that the determination of quality and condition was somewhat subjective and that the opinions of qualified appraisers with respect to the same property could vary. As noted, Newell expressed no opinion of the value of any of the subject properties, and the record therefore does not indicate whether or how Newell's opinions regarding quality and condition would affect values as determined by the assessor and the Board. The conflicting testimony regarding condition, quality, and value of the subject properties reflected nothing more than differences of opinion, with no correlation to value even if Newell's opinions were accepted.
Although Newell gave no opinions of value, Gary did. A resident owner who is familiar with his or her property and knows its worth is permitted to testify as to its value without further foundation.[21] This principle rests upon the owner's familiarity with the property's characteristics, its actual and potential uses, and the owner's experience in dealing with it.[22] Similarly, a corporate officer may be competent to offer an opinion of value, provided the officer is familiar with the property and has knowledge of general values in the vicinity.[23] When a county board of equalization has determined the value of the property, uniformly and impartially assessed through a formula in substantial compliance with statutes governing taxation, for reversal of the board's action, a taxpayer must show more than a difference of opinion concerning the assessed value of the taxpayer's real estate.[24]
Gary resided in one of the subject properties and was the president of the corporation which owned each of them. He did not utilize the Marshall & Swift valuation system in arriving at his opinions of the value of each property. His opinions were based upon his knowledge of unidentified "other properties" and "just a judgment call on my part of those experiences of having bought property and sold property in this area." He offered no details of any valuation or sales of comparable residential property. When asked on cross-examination how he arrived at the value of the residence occupied by his family, he replied: "Well, I don't want to get into it, but I have my own little formula that I use toon depreciation and so forth. It has nothing to do with the way the State does it or anybody else does and that's what I came up with."
The record supports TERC's finding that the taxpayer's evidence of actual value was not persuasive.

(d) External Depreciation
DRI argues that TERC erred in rejecting its argument that external or "locational" depreciation should have been applied in determining the value of Lane's house and the feedlot house, due to their proximity to a cattle feedlot. This argument has merit.
The Nebraska Court of Appeals addressed this issue in Livingston v. Jefferson Cty. Bd. of Equal.,[25] which involved *831 the valuation of a rural home located less than 1 mile from the owner's hog farrowing facility. TERC affirmed the assessed valuation of the home, and on appeal, the property owner argued that TERC erred in rejecting any external depreciation based on the proximity of the house to the hog facility. Noting that "[t]he whole concept of determining value must assume both a willing buyer and [a willing] seller," the court concluded:
It was arbitrary for the Board and TERC to ignore the effect that the nearby hog facility would have on the house's fair market value in the ordinary course of trade. No reasonable fact finder could conclude that in the real estate marketplace, a potential buyer would not notice, and react economically, to having a large hog facility very nearby while living in a remote location. Thus, the Board's valuation, and TERC's decision upholding that valuation, was arbitrary and capricious.[26]
In an unpublished opinion,[27] the Court of Appeals applied Livingston to the 2002 valuation of the DRI property which we refer to in this case as Lane's house. As in this case, Gary testified in that case that the home was located next to a 20,000-head cattle feedlot, causing problems with trucks en route to and from the feedlot, as well as dust and flies. He also testified that the truck traffic caused the home to vibrate and that the well for the home is connected to the cattle-watering facility. The Court of Appeals held that because this competent evidence was undisputed, TERC's decision upholding the Board's valuation for the property was unreasonable and arbitrary. The court reversed that portion of the TERC order and remanded the cause with directions to consider the proximity of the home to the feedlot in decreasing its value.
At the TERC hearing in this case, the assessor acknowledged that TERC ordered an adjustment in the 2002 and 2003 valuations of Lane's house due to its proximity to the feedlot. However, she testified that no similar adjustment was made in the 2004 valuation because she did not consider the home to be "close enough to the feedlot that it has the problems that the taxpayer contends." As to the feedlot house, which she acknowledged to be "actually in the feedlot," the assessor testified that she did not apply any "locational depreciation" because the house had "an 85 percent physical depreciation, which means that it's about worn out," and that she was "not sure" an additional depreciation allowance based upon location "would make that much difference."
An administrative agency's decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion.[28] It is undisputed that an external depreciation was applied in determining the valuations of these properties for 2002 and 2003, but not for 2004. Gary's description of the problems associated with the location of Lane's house, situated approximately one-eighth mile from the feedlot and next to its access road, is essentially the same as that summarized in the prior case decided by the Court of Appeals. The Board produced no evidence to refute these facts, other than the assessor's unsubstantiated *832 opinion that the property was not "close enough" to the feedlot and a photograph which depicts the home situated across the road from the feedlot. As to the feedlot house, there is no competent evidence in the record to support the assessor's position that depreciation based on useful life obviates the applicability of external depreciation based on the feedlot. The Board's valuations of Lane's house and the feedlot house and the affirmance by TERC were, for these reasons, arbitrary and unreasonable.

4. EQUALIZATION
DRI argues that TERC erred in concluding that equalization was not an issue on appeal because it had not been raised before the Board. Our review of the record shows that equalization was not raised or considered by the Board in setting the 2004 valuations for the subject properties. Equalization with respect to the subject residential properties is not mentioned on the protest forms filed by DRI or the summaries of the Board's disposition of each protest. The record includes a transcript of the hearing conducted by the Board at which Emilie Darnall appeared and spoke with respect to the protests. There is no reference to equalization, although it appears that the transcription is incomplete. Emilie testified at the TERC hearing that she discussed equalization when she appeared before the Board, but could not recall the specifics of her remarks in this regard. From this record, it cannot be determined with any certainty that any specific issue pertaining to equalization was presented to the Board, either in the protest forms or the subsequent hearing.
DRI argues that TERC should nevertheless have considered its equalization arguments under § 77-5016(7), which provides that TERC "may determine any question raised in the proceeding upon which an order, decision, determination, or action appealed from is based" and further provides that TERC "may consider all questions necessary to determine taxable value of property as it hears an appeal or cross appeal." We do not read this permissive statutory language as requiring TERC to consider issues not presented to a county board of equalization. Based on our review of the record, we conclude that TERC did not err in ruling that equalization was not an issue on appeal.

V. CONCLUSION
For the reasons discussed, we reverse the TERC order with respect to the valuation of Lane's house, parcel XXXXXXXXX, and the feedlot house, parcel XXXXXXXXX. As to those properties, we remand the cause to TERC with directions to adjust the 2004 valuations by applying external, or "locational," depreciation in the same manner as in 2002 and 2003. In all other respects, we affirm the TERC order.
AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.
NOTES
[1] Neb.Rev.Stat. § 77-5019(5) (Cum.Supp. 2006); Marshall v. Dawes Cty. Bd. of Equal, 265 Neb. 33, 654 N.W.2d 184 (2002).
[2] See Marshall v. Dawes Cty. Bd. of Equal., supra note 1.
[3] City of York v. York Cty. Bd. of Equal, 266 Neb. 297, 664 N.W.2d 445 (2003); City of Alliance v. Box Butte Cty. Bd. of Equal, 265 Neb. 262, 656 N.W.2d 439 (2003).
[4] Neb.Rev.Stat. § 77-5016(8) (Cum.Supp. 2006); Omaha Country Club v. Douglas Cty. Bd. of Equal, 11 Neb.App. 171, 645 N.W.2d 821 (2002).
[5] Brenner v. Banner Cty. Bd. of Equal., 276 Neb. 275, 753 N.W.2d 802 (2008).
[6] See Krusemark v. Thurston Cty. Bd. of Equal., 10 Neb.App. 35, 624 N.W.2d 328 (2001).
[7] Brief for appellant at 27.
[8] Neb.Rev.Stat. §§ 77-5015 to 77-5019 (Cum. Supp.2006 & Supp.2007).
[9] § 77-5016.
[10] See § 77-5016(1).
[11] Brenner v. Banner Cty. Bd. of Equal, supra note 5.
[12] § 77-5016(5).
[13] See Brenner v. Banner Cty. Bd. of Equal., supra note 5.
[14] Neb.Rev.Stat. § 77-112 (Reissue 2003).
[15] US Ecology v. Boyd Cty. Bd. of Equal., 256 Neb. 7, 588 N.W.2d 575 (1999); Cabela's, Inc. v. Cheyenne Cty. Bd. of Equal., 8 Neb.App. 582, 597 N.W.2d 623 (1999).
[16] Phelps Cty. Bd. of Equal. v. Graf, 258 Neb. 810, 606 N.W.2d 736 (2000).
[17] § 77-112.
[18] See Cabela's, Inc. v. Cheyenne Cty. Bd. of Equal., supra note 15.
[19] Kohl's Dept. Stores v. Douglas Cty. Bd. of Equal, 10 Neb.App. 809, 638 N.W.2d 877 (2002). See Brenner v. Banner Cty. Bd. of Equal, supra note 5.
[20] See Brenner v. Banner Cty. Bd. of Equal., supra note 5.
[21] See. US Ecology v. Boyd Cty. Bd. of Equal, supra note 15; Livingston v. Jefferson Cty. Bd. of Equal, 10 Neb.App. 934, 640 N.W.2d 426 (2002); Schmidt v. Thayer Cty. Bd. of Equal, 10 Neb.App. 10, 624 N.W.2d 63 (2001).
[22] Schmidt v. Thayer Cty. Bd. of Equal, supra note 21.
[23] See Kohl's Dept. Stores v. Douglas Cty. Bd. of Equal, supra note 19.
[24] Livingston v. Jefferson Cty. Bd. of Equal., supra note 21, citing Cabela's, Inc. v. Cheyenne Cty. Bd. of Equal, supra note 15.
[25] Livingston v. Jefferson Cty. Bd. of Equal., supra note 21.
[26] Id. at 947, 640 N.W.2d at 437.
[27] Darnall Ranch, Inc. v. Banner Cty. Bd. of Equal, No. A-04-199, 2005 WL 780379 (Neb. App. Mar.22, 2005) (not designated for permanent publication).
[28] See Phelps Cty. Bd. of Equal. v. Graf, supra note 16.