Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/26/2021 08:09 AM CDT

E. JANE EGAN AND JANIS HOWLETT, APPELLANTS,
v. COUNTY OF LANCASTER, NEBRASKA,
ET AL., APPELLEES.
___ N.W.2d ___

Filed December 31, 2020.    No. S-19-1048.

1. **Standing: Jurisdiction: Judgments: Appeal and Error.** Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court; determination of a jurisdictional issue which does not involve a factual dispute is a matter of law which requires an appellate court to reach its conclusions independent from those of a trial court.

2. **Statutes: Appeal and Error.** Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court.

3. **Political Subdivisions: Judgments: Appeal and Error.** When a decision regarding a conditional use or special exception permit is appealed under Neb. Rev. Stat. § 23-114.01(5) (Reissue 2012) and a trial is held de novo under Neb. Rev. Stat. § 25-1937 (Reissue 2016), the findings of the district court shall have the effect of a jury verdict and the court's judgment will not be set aside by an appellate court unless the court's factual findings are clearly erroneous or the court erred in its application of the law.

4. **Standing.** Standing relates to a court's power to address the issues presented and serves to identify those disputes which are appropriately resolved through the judicial process.

5. ____. The focus of the standing inquiry is not on whether the claim the plaintiff advances has merit; it is on whether the plaintiff is the proper party to assert the claim.

Appeal from the District Court for Lancaster County: JODI L. NELSON, Judge. Affirmed.

Gregory D. Barton, of Barton Law, P.C., L.L.O., for appellants.

Patrick Condon, Lancaster County Attorney, Jenifer T. Holloway, and Daniel J. Zieg for appellees County of Lancaster, Board of Commissioners of Lancaster County, and Planning Commission of Lancaster County.

Stephen D. Mossman and Joseph A. Wilkins, of Mattson Ricketts Law Firm, for appellee Randy Essink.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

The Lancaster County Board of Commissioners (the Board) granted Randy Essink a special use permit allowing him to construct and operate a poultry production facility on land within the county's agricultural zoning district. E. Jane Egan and Janis Howlett challenged that decision in district court, arguing that the proposed facility would lead to adverse effects on the environment, public health, local infrastructure, and property values. The district court found that Egan lacked standing to challenge the issuance of the special use permit and found that the permit was appropriately issued. Egan and Howlett now appeal. Finding no error in the district court's decision, we affirm.

## BACKGROUND

*Essink's Proposed Facility and*
*Applicable Zoning Regulations.*

Essink began contemplating a new business venture when he learned that Lincoln Premium Poultry (LPP) was recruiting individuals to raise broiler chickens that would be processed by LPP for sale to Costco. After obtaining more information, Essink identified and purchased a piece of property in Lancaster County that he believed would meet LPP's

requirements. On May 14, 2018, Essink submitted an application to Lancaster County's planning department for a special use permit that would allow him to operate a commercial feedlot on his farm.

Essink's application for a special use permit was necessary under the 1979 Zoning Resolution of Lancaster County (the zoning regulations). The zoning regulations designate zoning districts, including an agricultural district in which Essink's property is located. Article 4 of the zoning regulations states that the agricultural district "is designated for agricultural use and is intended to encourage a vigorous agricultural industry throughout the county and to preserve and protect agricultural production by limiting urban sprawl as typified by urban or acreage development." With a special use permit, buildings within the agricultural district may be used as commercial feedlots. The parties do not dispute that Essink's proposed operation qualifies as a commercial feedlot.

Under the zoning regulations, an application for a special use permit is initially submitted to the Lancaster County Planning Commission (the Commission). The Commission is required to then hold a public hearing. Article 13, section 13.002, of the zoning regulations directs that in considering the application, the Commission is to "consider the effect of such proposed building or uses upon the character of the neighborhood, traffic conditions, public utility facilities, the Comprehensive Plan and any other matters relating to the public health, safety and general welfare." The zoning regulations allow decisions of the Commission regarding special use permits to be appealed to the Board.

*Planning Commission.*

After Essink submitted his application, the Commission scheduled a public hearing. At the hearing, county officials provided testimony, as did witnesses called by Essink and community members opposed to the issuance of the special use permit. The Commission also received documentary

evidence. At the conclusion of the hearing, the Commission approved the special permit subject to certain conditions on a 6-3 vote.

The Commission's decision was appealed to the Board.

*County Board.*

The Board held a public hearing regarding the application for a special use permit. At the hearing, Essink and other proponents of the special use permit provided testimony as did community members who opposed issuance of the special use permit.

The Board approved the special use permit subject to certain conditions to which Essink agreed on a 3-2 vote. Egan and Howlett appealed the Board's decision to the district court.

*District Court.*

The district court held a bench trial. The records of the public hearings before the Commission and the Board were received as evidence.

Egan lives on an acreage 12.7 miles from Essink's property. Egan testified that she was concerned that Essink's proposed operation would result in pollution and depreciation of the value of surrounding property. She also testified that she was concerned that if Essink's proposed operation was approved, a similar operation might be approved near her property. Howlett lives 0.6 miles from Essink's property. She testified that she was concerned that the proposed facility would result in reduced air quality and depreciation of the value of her property.

The district court also received evidence regarding Essink's proposed facility. That evidence included testimony from a representative of LPP who testified regarding the training LPP provides to its growers and the standards it requires them to follow. He explained that LPP service technicians monitor growers' compliance with those standards. LPP requires that its growers work with a nutrient management company. A representative from a nutrient management company testified

that the company had been retained to develop a nutrient management plan for Essink's operation and explained the details of that plan.

The county planner testified that the application for a special permit met the criteria for approval under the zoning regulations. Evidence in the record also indicated that the application was reviewed by the Lower Platte South Natural Resources District, the Nebraska Department of Environmental Quality, and the Lincoln-Lancaster County Health Department and that none of these entities objected to the application. Additional evidence in the record will be discussed as necessary in the analysis section below.

The district court affirmed the issuance of the special use permit in a written order. The district court concluded that Egan did not have standing. It went on to consider whether the special use permit was appropriately issued. After summarizing the evidence, the district court concluded that the application exceeded the criteria for approval as set forth in the zoning regulations. It approved the special use permit subject to certain conditions to which Essink agreed.

Egan and Howlett appealed.

ASSIGNMENTS OF ERROR

Egan and Howlett assign, condensed and restated, that the district court erred by (1) failing to find that Egan had standing and (2) finding that the special use permit was properly approved.

STANDARD OF REVIEW

[1] Standing is a jurisdictional component of a party's case, because only a party who has standing may invoke the jurisdiction of a court; determination of a jurisdictional issue which does not involve a factual dispute is a matter of law which requires an appellate court to reach its conclusions independent from those of a trial court. *Griffith v. Nebraska Dept. of Corr. Servs.*, 304 Neb. 287, 934 N.W.2d 169 (2019).

[2] Statutory interpretation is a question of law, which an appellate court resolves independently of the trial court. *DeLima v. Tsevi*, 301 Neb. 933, 921 N.W.2d 89 (2018).

[3] When a decision regarding a conditional use or special exception permit is appealed under Neb. Rev. Stat. § 23-114.01(5) (Reissue 2012) and a trial is held de novo under Neb. Rev. Stat. § 25-1937 (Reissue 2016), the findings of the district court shall have the effect of a jury verdict and the court's judgment will not be set aside by an appellate court unless the court's factual findings are clearly erroneous or the court erred in its application of the law. *In re Application of Olmer*, 275 Neb. 852, 752 N.W.2d 124 (2008).

## ANALYSIS

*Standing.*

The district court concluded that Egan lacked standing to challenge the issuance of the special use permit. Because standing is a jurisdictional issue, we address it first. See *Central Neb. Pub. Power Dist. v. North Platte NRD*, 280 Neb. 533, 788 N.W.2d 252 (2010).

[4,5] Standing relates to a court's power to address the issues presented and serves to identify those disputes which are appropriately resolved through the judicial process. *Griffith, supra*. The focus of the standing inquiry is not on whether the claim the plaintiff advances has merit; it is on whether the plaintiff is the proper party to assert the claim. See *Heiden v. Norris*, 300 Neb. 171, 912 N.W.2d 758 (2018).

The district court found that Egan was not a proper party to object to the special use permit because she lives nearly 13 miles from the proposed operation and had not shown that she would be injured by its issuance. Generally, a party has standing only if he or she has suffered or will suffer an injury in fact. See *Central Neb. Pub Power Dist., supra*. We have said that such an injury must be "concrete in both a qualitative and temporal sense," that it must be "distinct and palpable, as opposed to merely abstract," and that the alleged harm must be "actual or imminent, not conjectural or hypothetical."

*Id.* at 542, 788 N.W.2d at 260. We have also emphasized that it is generally insufficient for standing purposes for a plaintiff to have "merely a general interest common to all members of the public." *Ritchhart v. Daub*, 256 Neb. 801, 806, 594 N.W.2d 288, 292 (1999).

Egan does not quarrel with the district court's conclusion that she could not demonstrate an injury in fact. We do not see how she could. Egan testified that she opposed the special use permit as a member of the public and a taxpayer. She expressed concerns that Essink's proposed operation would result in pollution and depreciate the value of surrounding properties owned by others. While Egan also testified that she feared that approval of this special use permit might lead to the approval of similar operations near her property, she did not identify any way in which her legal interests would be injured as a result of the approval of a permit for operation of a feedlot approximately 13 miles from her home. Because Egan did not identify any injury peculiar to herself, we agree with the district court that she did not demonstrate she has suffered or will suffer an injury in fact.

Though Egan cannot demonstrate an injury in fact, she maintains that she nonetheless has standing. She argues that she has standing under an exception to the general injury-in-fact requirement and under a specific statute. As we will explain, we disagree with both arguments.

Our cases have recognized some exceptions to the usual requirement that a plaintiff demonstrate an injury in fact. See *Griffith v. Nebraska Dept. of Corr. Servs.*, 304 Neb. 287, 934 N.W.2d 169 (2019). According to Egan, she has standing under one such exception. In support of this argument, Egan relies on *Thompson v. Heineman*, 289 Neb. 798, 857 N.W.2d 731 (2015).

In *Thompson*, parties opposed to the construction of an oil pipeline brought an action against state officials, seeking a declaratory judgment that a statute allowing pipeline carriers to bypass the regulatory procedures of the Public Service Commission and obtain approval to exercise the power of

eminent domain for the building of the pipeline from the Governor was unconstitutional. While plaintiffs did not establish traditional injury-in-fact standing, four members of the court found that plaintiffs had standing under an exception to the injury-in-fact requirement for matters of "great public concern" first recognized in *Cunningham v. Exon*, 202 Neb. 563, 276 N.W.2d 213 (1979). The four members of the court who found that the great public concern exception applied in *Thompson* did so because the claims at issue were analogous to "claims involving the election of representatives and the way the constitution can be changed" in that they involved "the citizens' interest in their form of government." 289 Neb. at 822, 857 N.W.2d at 751.

Three members of the court disagreed that plaintiffs had standing. See *Thompson, supra* (Heavican, C.J., and Stephan and Cassel, JJ., dissenting in part, and in part concurring in the result). Because those three members of the court believed jurisdiction was lacking, they expressed no opinion as to whether the statute at issue was unconstitutional. And because five judges did not find the statute unconstitutional, the district court's decision finding the statute unconstitutional was vacated pursuant to the supermajority requirement of article V, § 2, of the Nebraska Constitution.

The parties in this case have assumed that the opinion of four judges finding that the *Thompson* plaintiffs had standing under the great public concern exception is controlling precedent. We need not address the accuracy of that assumption, because, even if *Thompson* is controlling, it does not assist Egan here. While Egan asserts that this case is a matter of great public concern, she makes no attempt to show that the issuance of a special use permit for a specific location, as in *Thompson*, involved "the citizens' interest in their form of government." 289 Neb. at 822, 857 N.W.2d at 751. Indeed, Egan's challenge is aimed entirely at the substance of a governmental decision rather than challenging the legal authority of those who made it.

At oral argument, Egan's counsel acknowledged that Egan "does not fall within the same circumstances" as the plaintiffs in *Thompson*, but requested that we "extend" the great public concern exception to Egan's challenge in this case. We decline Egan's invitation. We have previously emphasized that "[e]xceptions to the rule of standing must be carefully applied in order to prevent the exceptions from swallowing the rule." *State ex rel. Reed v. State*, 278 Neb. 564, 571, 773 N.W.2d 349, 355 (2009). Consistent with that principle, we have rejected the argument that a plaintiff has standing under the great public concern exception merely because he or she is alleging that public officials are not acting within statutory limits. See, e.g., *Neb. Against Exp. Gmblg. v. Neb. Horsemen's Assn.*, 258 Neb. 690, 605 N.W.2d 803 (2000) (holding that plaintiffs challenging state commission's issuance of licenses to conduct simulcast horseracing as contrary to statutory authority lacked standing under great public concern exception). Given this precedent, we see no principled basis by which we could find that the challenge made here—that the officials given the authority to issue special use permits erred in doing so—is one that can be raised by a taxpayer under the great public concern exception.

This leaves Egan's argument that she has standing under a statute, Neb. Rev. Stat. § 23-114.05 (Reissue 2012). Section 23-114.05 provides in relevant part: "The erection, construction, reconstruction, alteration, repair, conversion, maintenance, or use of any building, structure, automobile trailer, or land in violation of sections 23-114 to 23-114.04 . . . or any regulation made by the county board under such sections shall be a misdemeanor." The referenced regulations encompass county zoning regulations. Section 23-114.05 further provides:

> In addition to other remedies, the county board or the proper local authorities of the county, as well as any owner or owners of real estate within the district affected by the regulations, may institute any appropriate action or proceedings to prevent such unlawful construction,

erection, reconstruction, alteration, repair, conversion, maintenance, or use, to restrain, correct or abate such violation, or to prevent the illegal act, conduct, business, or use in or about such premises.

Egan argues that because she is an owner of real estate within the agricultural zoning district, she has standing under § 23-114.05 to challenge the issuance of the special use permit even if she cannot demonstrate an injury in fact.

Although the Legislature may, so long as it acts within the bounds of other constitutional provisions, confer standing that is broader than the common-law baseline, see *Griffith v. Nebraska Dept. of Corr. Servs.*, 304 Neb. 287, 934 N.W.2d 169 (2019), § 23-114.05 does not confer standing on Egan in this case. Section 23-114.05 allows "owners of real estate within the district affected by the regulations" to bring an action to prevent the use of property in violation of, among other things, zoning regulations, which violation is made a misdemeanor by the statute. But there is no suggestion in this case that Essink committed a criminal offense by, for example, constructing a building in violation of zoning regulations. Instead, this case arose because Essink, *pursuant to* zoning regulations, sought and obtained a special use permit before constructing a commercial feedlot. A different statute, § 23-114.01(5), authorizes appeals of decisions regarding special use permits to the district court, but that statute does not contain similar expansive language allowing all "owners of real estate within the district affected by the regulations" to bring such appeals. Egan does not have standing under § 23-114.05.

While the district court correctly concluded that Egan lacked standing, it apparently concluded that Howlett had standing, as it went on to consider the merits of her challenge to the issuance of the special use permit. We agree that Howlett, who testified that her home was just 0.6 miles from the site of the proposed facility, satisfied the injury-in-fact requirement and had standing. We will thus go on to consider her assignment of error challenging the district court's order affirming the issuance of the special use permit.

*Merits.*

Howlett's argument that the district court committed reversible error by affirming the issuance of the special use permit hinges on article 13.002 of the zoning regulations. Section 13.002 states in relevant part:

> Before the issuance of any special permit of any buildings or uses, the County Board shall refer the proposed application to the Planning Commission. The Planning Commission shall hold a public hearing and shall consider the effect of such proposed building or uses upon the character of the neighborhood, traffic conditions, public utility facilities, the Comprehensive Plan and other matters relating to the public health, safety and general welfare.

Howlett argues that the district court, in its review of the decision of the Board, was also required to consider the factors enumerated above. She argues the district court failed to consider the effect Essink's proposed facility would have on the character of the neighborhood, traffic conditions, and the public health, safety, and general welfare.

Howlett's argument, however, immediately encounters a formidable obstacle. In its order affirming the issuance of the special use permit, the district court stated that it had considered the very factors Howlett contends it did not. The order states that the district court had considered Essink's application, the applicable zoning regulations, and "the evidence presented relating to the effect of the proposed buildings and use upon the character of the neighborhood, traffic conditions . . . and other matters relating to the public health, safety and general welfare."

According to Howlett, the district court cannot be taken at its word as to the factors it considered in affirming the issuance of the special use permit. Instead, she contends that, given the evidence in the record, the district court could not possibly have considered the effect Essink's proposed operation would have on the character of the neighborhood, traffic conditions, and the public health, safety, and general welfare and still

affirmed the issuance of the special use permit. We discuss the evidence to which Howlett points and the arguments she makes below.

In support of her argument that the district court could not have considered the effect Essink's proposed operation would have on the character of the neighborhood, Howlett points to her own testimony that the number of residences in the area of Essink's proposed operation had substantially increased from the time Howlett moved to the area in 1973. Howlett testified that there were currently 70 residences in an area depicted on a map received as an exhibit at trial.

In support of her argument that the district court could not have considered the effect Essink's proposed operation would have on traffic conditions, Howlett points to testimony of a licensed civil engineer. This engineer testified that because there would be increased use of the adjacent road, the county would be required to make improvements to allow for that usage.

Howlett also argues that the district court could not have considered the effect the proposed facility would have on the public health, safety, and general welfare and affirmed the issuance of the special use permit. Here, Howlett argues that the proposed facility would reduce air quality and produce odor. She also argues that the facility would result in the reduction of property values of neighboring landowners. Finally, she emphasizes Essink's lack of experience in operating a poultry facility and suggests that this lack of experience is a risk to the public health, safety, and general welfare.

We disagree with Howlett that the district court could not possibly have considered the factors she identifies and affirmed the issuance of the special use permit. In reaching this conclusion, we are mindful that the applicable standard of review requires that we treat the findings of the district court in the same way we would treat a jury verdict, not setting aside the district court's judgment unless its factual findings are clearly erroneous or the court erred in its application of

the law. See *In re Application of Olmer*, 275 Neb. 852, 752 N.W.2d 124 (2008). As we will explain, the evidence on each of the factors Howlett identifies was not as one-sided as she suggests and certainly did not preclude the district court from finding the special use permit was appropriately issued.

With respect to the character of the neighborhood, Howlett attempts to portray the surrounding area as residential. In her testimony, however, she acknowledged that some of the 70 nearby residences she referenced were not in Lancaster County. The county planner also testified that while there were some acreage lots in the surrounding area, it was "mostly still in agricultural use." He also testified that a residential acreage development Howlett identified was over a mile away from the proposed site of Essink's facility. Further, while section 13.002 of the zoning regulations calls for consideration of the character of the neighborhood, the district court could also consider that Essink's property was located in the agricultural district and that article 4 of the zoning regulations provides that the agricultural district "is designated for agricultural use and is intended to encourage a vigorous agricultural industry throughout the county and to preserve and protect agricultural production by limiting urban sprawl as typified by urban or acreage development."

Howlett's argument regarding the effect of Essink's proposed facility on traffic also takes a selective view of the evidence in the record. While she highlights testimony from a witness who believed that the increased traffic from the proposed facility would require the county to improve the adjacent road, the record also contains evidence that the county engineer did not believe, based on the anticipated increased traffic of 1.4 trucks per day, that the road would require improvement.

Howlett fares no better with her argument that the district court could not have considered the effect the proposed facility would have on the public health, safety, and general welfare. Although she asserts that the facility will reduce air quality

and lead to offensive odor, she does not point to concrete evidence supporting this assertion. In contrast, there is evidence in the record that a tool developed by the University of Nebraska Institute of Agriculture and Natural Resources estimated that even the immediate vicinity of the proposed facility would be free of odor 94 percent of the time. An official from the Lincoln-Lancaster County Health Department also testified that the proposed operation would be subject to the department's enforcement of county air pollution regulations and that the department has the authority to, if necessary, ensure Essink is using reasonable odor control techniques.

Howlett also asserts that the proposed facility will cause the value of surrounding property to decrease, but again does not point to nonspeculative evidence supporting this assertion. Instead, Howlett argues the district court was required to find the proposed facility would lead to decreased property values even in the absence of such evidence. She argues the district court was compelled to do so by *Darnall Ranch v. Banner Cty. Bd. of Equal.*, 276 Neb. 296, 753 N.W.2d 819 (2008). In that case, a property owner appealed a county board of equalization's determination of his property value to the Tax Equalization and Review Commission. The property at issue was near a 20,000-head cattle feedlot, and there was unrefuted evidence that there were problems with dust and flies, that trucks traveling to and from the feedlot caused the home on the property to vibrate, and that the well for the home was connected to the cattle-watering facility. We held, under those circumstances, that the Tax Equalization and Review Commission's failure to consider the effect the proximity of the feedlot would have on the property was arbitrary and unreasonable.

We disagree that *Darnall Ranch* has any application here. This is not a challenge to the valuation of property. And, even setting that major difference aside, we relied on unrefuted evidence of the adverse effects of the feedlot in *Darnall Ranch* before concluding that it was unreasonable to fail to take the

feedlot into account when determining the property's value. Howlett has not identified any similar evidence here.

Finally, we disagree that evidence of Essink's inexperience in running a poultry operation demonstrates that the district court did not consider the effect his facility would have on the public health, safety, and general welfare. Essink acknowledged his lack of experience, but Howlett cannot point to any evidence that a lack of experience will lead to detrimental effects on the public health, safety, and general welfare. Moreover, a representative of LPP testified that experience raising poultry is not necessary to be an LPP supplier and, in fact, may be preferable because LPP provides training and support and new suppliers have "no bad habits."

To this, Howlett argues that there is no assurance that LPP will provide the referenced training and support because there was no evidence in the record that Essink and LPP had entered into a contractual relationship. We disagree that this evidences a lack of commitment to Essink on the part of LPP. The record shows Essink has already received guidance and support from LPP. In addition to the evidence presented at trial, the fact that a representative of LPP testified at the district court in favor of Essink's application demonstrates a commitment to assisting Essink with his proposed operation.

In sum, the district court stated that it considered the factors identified in section 13.002 of the zoning regulations, and we see no basis to question that assertion. Neither has Howlett identified any other error of law or clearly erroneous finding of fact. There is thus no basis to reverse the district court's decision.

## CONCLUSION

Because the district court did not err in affirming the county board's issuance of the special use permit, we affirm.

Affirmed.